## TURNER ET AL. *v.* BROCATO ET AL.

[No. 73, October Term, 1954.]

338

*Decided February 21, 1955.*

*Motion for rehearing filed March 21, 1955, denied March 23, 1955.*

The cause was argued before DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Charles G. Page,* with whom were *H. Warren Buckler, Jr.,* and *B. Taylor McLean,* on the brief, for appellants.

*Charles C. Atwater* and *Walter C. Mylander, Jr.,* with whom was *Samuel M. Campanaro,* on the brief, for the appellees, Ralph Brocato and Joseph Raymond.

*Thomas N. Biddison,* City Solicitor of Baltimore, *Edwin Harlan,* Deputy City Solicitor, and *John R. Cicero,* Assistant City Solicitor, submitted a statement on behalf of Mayor and City Council of Baltimore and Paul A. Cohen, Building Inspector Engineer of Baltimore City.

HAMMOND, J., delivered the opinion of the Court.

The bill of complaint in this case was brought by the appellants, owners of homes in a residential development in the northern suburbs of Baltimore, whose lots were subject to restrictions against use for business, to obtain a declaration that the lot of the appellees was part of the development and, as such, similarly restricted, although it had been deeded by the developer free of restrictions. Right to relief was based on the claim that the developer, either expressly by deed, or by necessary implication from a course of conduct under the general plan of development, or both, had promised that all of the land retained by him was, and must continue to be, burdened by the same restrictions he had imposed on each lot as he had conveyed it and that

in equity those who had become grantees with notice that the promise applied to their grants, were bound by it at the suit of one similarly bound. The chancellor held that the appellants had not met the burden of showing the restrictions which the developer had placed on their lots were for the common benefit and advantage of all those who had bought from him, rather than being personal to him, and that, consequently, he could, if he so desired, convey free of restrictions, any part of the tract which he had retained. The appeal is from the dismissal of the bill.

The facts are not in real dispute. In 1927, Charles G. Fenwick bought a tract of land of some forty-seven acres near the northern limits of Baltimore, bounded on the east by Roland Park, on the west by Falls Road, and on the south by land owned by the Penniman family. The land rises sharply from Falls Road toward Roland Ave. and is divided by Bellemore Road, running east and west between those two thoroughfares. Fenwick bought the land, which he called Poplar Hill, to resell as building sites for expensive residences. He caused to be prepared a plat of the whole tract, designated the Sutton-Britcher plat and dated August 24, 1927. On it was drawn a line roughly parallel to and about three hundred seventy feet east of Falls Road. Seventy-five numbered lots were laid out to the east of this line, thirty-eight comprising Section A and thirty-seven, Section B. The remaining land, to the west of these sections and to the east of Falls Road, was designated as Section C. This was not then subdivided into lots. On August 31, 1927, Fenwick sold his first lot, one in Section A. The deed imposed on the lot what came to be known as Poplar Hill restrictions. With three exceptions, every lot in the entire tract was sold subject to the same restrictions, running in each case, fifty years from the date of the conveyance. Fenwick covenanted in the first deed that the restrictions in it should apply to all lots in Section A "but shall not apply to the other remaining property belonging to the party of the first part". A

few days later, a second lot was sold in Section B; in the deed the same restrictions were imposed on the grantee and the grantor promised that they applied to all lots in Section B. It was repeated that they did not apply to his remaining land. In July, 1929, Fenwick sold the first lot in Section C, lot seventy-eight, which is owned now by an appellant and is next to the lot in dispute. In the deed, the restrictions which had been imposed on lots in Sections A and B were incorporated by reference. From then on, all of Poplar Hill was in course of active development. A revision of the Sutton-Britcher plat was prepared, dated February 10, 1930, on which was the legend. "This plat supersedes plat dated August 24, 1927". The revision showed no division into sections but on it were added, to the seventy-five numbered lots in what had been Sections A and B, twelve additional lots in what had been designated Section C, numbered seventy-seven to eighty-eight. It was not recorded but a number of recorded deeds in Section C, and elsewhere, in Poplar Hill refer to it. A reproduction of the revised plat, on which were drawn lines indicating a right-of-way, was recorded with a deed from Fenwick to Baltimore City, granting a right-of-way for sewers. That recorded plat bears the legend "See plat of Poplar Hill dated February 10, 1930".

Unnumbered on the revised Sutton-Britcher plat was a finger of land on the southeast corner of Falls Road and Bellemore Road, running some five hundred feet along Falls Road south of Bellemore Road, with a depth of approximately one hundred feet. It, like the rest of Section C, had been unnumbered on the first plat. A part of this finger of land is the subject of this controversy. The northern one hundred fifty feet of it is the land owned by the appellees, acquired by them in 1953 from one Bushman, who had acquired it from Fenwick without restrictions and, in turn, had so conveyed it. The appellees' land is contiguous on the east to lot seventy-eight, the first lot sold in Section C.

To the south of appellees' lot, Fenwick still owns frontage of one hundred eighty-five feet on Falls Road. Still further to the south along Falls Road is the remainder of the original finger of land, which is now owned by a man named Somers, who purchased it from Fenwick free of restrictions. He uses forty feet of it next to his store, which adjoins it to the south, as a parking space for customers. The residents of Poplar Hill were not aware that the land Somers bought was in the development and, because of its location and topography, feel that its use will not harm them.

Fenwick stopped referring to sections and remaining land early in the development. The first deed which omitted these references was in October, 1929. From then until now, only two deeds out of fifty-eight have mentioned sections or remaining land of the grantor. These were in 1931. Sometimes the same such deed conveyed a lot in Section C and lots in other sections, with the same restrictions binding each. It is agreed that all of the lots in what were originally Sections A and B are restricted. All of the lots in Section C were conveyed subject to restrictions, except lot eighty-six, and the Somers lot, and the lot of the appellees. Unexplained is the exception of lot eighty-six. Its owners, who are appellants, agree it is bound to the same extent as all other lots in the development.

The western gateway to Poplar Hill, where Bellemore Road meets Falls Road, is between the house which was on the tract when Fenwick bought it, the so-called gatehouse on lot eighty-eight, on the north, and the appellees' lot, on the south. Just about the time Fenwick started to open up the lots in Section C in 1929, a large sign was hung on the appellees' lot just across from the gatehouse, which had been the second lot sold in Section C. It stated in conspicuous letters: "Poplar Hill—A Restricted Residential Development—Albert P. Strobel, Jr. Co., Agents". Such a sign remained there continuously for some twenty years, until March, 1950. From 1930 on, Strobel has been the exclusive sales

agent for Poplar Hill. Almost everyone who was interested in, and all who bought in Poplar Hill, were given a sales plat identical with the revised Sutton-Britcher plat, showing the division of the development into lots numbered one to eighty-eight, with no reference to sections. The standard phrase "subject to Poplar Hill restrictions" was included in all contracts of sale. In addition, Strobel prepared separate lists of restrictions, which did not mention sections or the remaining land of the grantor, and these were distributed to those interested in purchasing lots and to those who did purchase. At the trial, appellees conceded on the record that the lot owners of Poplar Hill, largely those in Section C, who were in the courtroom as witnesses, would testify that they had bought their properties in reliance upon the restrictions being applicable to Poplar Hill, that they had built expensive properties on their lots and that they regard them as now being covered by the restrictions. Strobel testified that the restrictions were a selling point, that the majority of the buyers would not have bought in a high class, residential development like Poplar Hill without such restrictions. A member of the bar, one of the appellants, took the stand. He testified that he bought his first lot in 1937, in what was originally Section C, and on cross-examination said: "* * * my very firm recollection was at the time the restrictions applied to the entire Poplar Hill development. * * * When I acquired the properties, it was my impression at the time, and it is still my impression and my understanding, that the restrictions applied to the entire development of which I was supplied a copy of the plat, subject only to the right of Dr. Fenwick, the developer, to waive certain of those restrictions * * *. That was certainly my understanding, yes. I would not have accepted the restrictions if I had not believed that they were going to apply to everybody."

Poplar Hill restrictions were divided into two classes: those relating to front yard measurements, walls, open

spaces, and approval of plans by an architect, comprised one class; the other group forbade the maintenance or operation of a number of specified noxious or offensive trades or businesses on the land conveyed and its restriction to use "for one single one-family residence only, together with a private garage for the sole use of the owner of the lot upon which it is located, and other structures appurtenant to the main residence, to be used in connection therewith and not for the purpose of trade." The reference of the lawyer witness to matters which could be waived was to the first group of restrictions. Fenwick, for himself, his heirs and assigns, always reserved the right to waive any of the first group as to any part of Poplar Hill owned by him or them at any time. Never was the right reserved to waive the second group of restrictions so as to allow business in the development.

The appellees produced evidence that their lot, at the southeast corner of Falls and Bellemore Roads, was a high bluff unsuited for residential use. They showed that to the south of it, opposite the Kelly Avenue bridge at Mt. Washington, is a cluster of business properties, and to the north of it—north of the gatehouse—is a tavern; that there is a tavern across Falls Road to the north, that Jones Falls runs as an open storm drain directly opposite the lot, and that west of Jones Falls, are a group of buildings owned, and used for manufacturing, by the Maryland Nut and Bolt Company. It is suggested that this renders the lot suitable only for commercial or industrial use, and appropriate for the use they intend—a cleaning establishment.

The appellees say further that the evidence shows that they had neither actual knowledge nor constructive notice of any equities claimed by the appellants. They deny that any restriction imposed by Fenwick was intended by him to, or did, bind any land he continued to hold in Section C. Further, they say that if any part of Section C retained by Fenwick was bound by the restrictions, the finger of land, of which they now own

a part, was not included because of its unsuitability for residential use and the fact that it was unnumbered.

We think it clear that the finger of land was a part of Poplar Hill and a part of Section C. It was part of the tract Fenwick bought. It was shown as part of the development on all of the plats. The sign advertising Poplar Hill as a restricted residential development stood for twenty years on this very lot. The evidence of the case seems to leave no doubt that it was always regarded by those who dealt with the property as a part thereof. The fact that it was unnumbered would not seem to be decisive. *Snow v. Van Dam* (Mass.) 197 N. E. 224. The argument that the finger of land was not intended as, and was not in fact, part of the development because it faces Falls Road, is difficult to maintain in the face of the fact that lot eighty-eight, on which stands the gatehouse, is on Falls Road and was sold for residential purposes early in the development, and is so used today.

The law of the case seems clear. In *McKenrick v. Savings Bank,* 174 Md. 118, 128, Judge Offutt, who wrote the opinion of the Court, reviewed the early Maryland cases in detail, and then said: "These cases sufficiently establish as the law of this state these principles: That one owning a tract of land, in granting a part thereof, may validly impose upon the part granted restrictions upon the use thereof for the benefit of the part retained, and upon the part retained for the benefit of the part granted, or upon both for the benefit of both; that, where the covenants in the conveyance are not expressly for or on behalf of the grantor, his heirs and assigns, they are personal and will not run with the land, but that, if in such a case it appears that it was the intention of the grantors that the restrictions were part of a uniform general scheme or plan of development and use which should affect the land granted and the land retained alike, they may be enforced in equity; that covenants creating restrictions are to be construed strictly in favor of the freedom of the land,

and against the person in whose favor they are made; and that the burden is upon one seeking to enforce such restrictions, where they are not specifically expressed in a deed, to show by clear and satisfactory proof that the common grantor intended that they should affect the land retained as a part of a uniform general scheme of development."

It is established that the jurisdiction of equity to enforce certain rights in respect of land is not necessarily dependent upon technicalities which are so important at law, such as, does the covenant run with the land and the extent of the running of the benefits and burdens? Equity acts under the rule laid down in *Tulk v. Moxhay,* 11 Beav. 571 (2 Phil. 774), where a covenant by the grantee of a piece of land to use it as a private square was enforced against a purchaser from the grantee with notice. The Lord Chancellor said the question was not "* * * whether the covenant ran with the land, but whether a party shall be permitted to use the land in a manner inconsistent with the contract entered into by his vendor, and with notice of which he purchased." His answer to the question was this: " * * * If an equity is attached to the property by the owner, no one purchasing with notice of that equity can stand in a different situation from the party from whom he purchased." This Court agreed with that answer in *Newbold v. Peabody Heights Co.,* 70 Md. 493, 502. Again, in *Levy v. Dundalk Co.,* 177 Md. 636, 646, Judge Parke said for the Court: "Under such circumstances, the equity which is attached to the property is not detached by the transmission of title."

The decisions of this Court have long recognized that equity, under appropriate facts, will enforce what variously has been called reciprocal negative easements, implied equitable reciprocal servitudes or merely equities attached to land. In determining whether the facts justified relief, the Maryland cases, early and late, consistently have looked not only to language in deeds, which gratified the requirements of the statute of

frauds, but also to matters extrinsic—conduct, conversation and correspondence—to find and give effect in equity to the actual intent. *Peabody Heights Co. v. Willson,* 82 Md. 186; *Summers v. Beeler,* 90 Md. 474; *Safe Deposit & Trust Co. v. Flaherty,* 91 Md. 489; *Beetem v. Garrison,* 129 Md. 664; *Sowers v. Holy Nativity Church,* 149 Md. 434; *Fitzsimmons v. South Realty Corp.,* 162 Md. 108; *Ringgold v. Denhardt,* 136 Md. 136; *McKenrick v. Savings Bank, supra; Levy v. Dundalk Co., supra; Schlicht v. Wengert,* 178 Md. 629; *Scholtes v. McColgan,* 184 Md. 480; *Williams Realty Co. v. Robey,* 175 Md. 532; *Martin v. Weinberg,* 205 Md. 519, 109 A. 2d 576; *Adams v. Parater,* 206 Md. 224, No. 29, this term. This being so, we think it would serve no good purpose to attempt to decide the true, underlying concept of the principle which has been held to control. Different views have been taken as to the right of equity to rely and .act on matters which would not satisfy the statute of frauds.

One group of writers and cases says that restrictions are to be treated as contracts concerned or relating to the enjoyment of the land, to be specifically enforced against the promisee or purchaser with notice but inoperative as a conveyance of any interest in the land itself. On this theory, beneficiaries of the contract, although not party to it, may enforce it and the statute of frauds is irrelevant. Another view treats the restrictions, although equitable in origin, as creating interests in the land itself, somewhat like easements at common law. Where this view prevails, the statute sometimes has been applied. For interesting discussions as to the two views, see 3 *Tiffany, Real Property,* 3rd Ed., Sec. 860-867; II *American Law of Property,* Ch. II, Sec. 9.30-9.33; 8 Md. L. R. 307; and *Bristol v. Woodward,* 251 N. Y. 275, 167 N. E. 441, at 445, 446. It may well be that the rule has come to be *sui generis* and that Judge Cardozo gave the real answer in the case just cited. He put it thus: "Difficulties there are in either view if the underlying concept is pressed to the limit of its

logic. * * * Perhaps it is enough to say that the extension of the doctrine, even if illogical, has been made too often and too consistently to permit withdrawal or retreat. * * *

"We do not need to choose now between these conflicting methods of approach * * *. Each of the two methods will doubtless have contributed a share to the ultimate generalization. In the end we may find that they have come together so often and in so many ways that there is no longer space between the paths, no longer choice to make between them. What began as a contractual right may be so protected by remedies, legal and equitable, that it will be indistinguishable from a real interest, a title to the land itself. What has thus developed into an interest may retain such traces and reminiscences of its contractual history that for the purpose of the statute of frauds, its quality will be determined according to its origin."

Where the terms of the deeds show that the covenants are to bind the heirs and assigns of the grantee and the grantor, it may be found that the restrictions were not for the sole benefit of the grantor and binding only on the grantee, but rather were to have the effect of running with the land. In some of the deeds, Fenwick and the vendee each entered into the restrictive covenants for himself, his heirs and assigns. In almost all deeds he reserved the right to himself, his heirs and assigns, to waive one group of restrictions. In a number of deeds, he did this specifically with respect to "any part of the tract" still retained. The appellants argue that each class of deeds requires a finding that the remaining land of the grantor was restricted. They say that the first class shows this by the use of the phrase "heirs and assigns" in the covenant imposing all the restrictions. They find in the second class an implied covenant, binding all of the tract, arising from silence as to the right to waive the restriction here involved, as contrasted with the spelled out right in Fenwick, his heirs and assigns, to waive the other restrictions as to any

part of the tract. It may well be that the appellants are correct in their contention. *Bristol v. Woodward, supra,* at p. 442 of 167 N. E.; *Fitzsimmons v. South Realty Corp., supra; Middleton Realty Co. v. Roland Park Civic League,* 197 Md. 87, 93, 95; *Martin v. Weinberg, supra;* and *Adams v. Parater, supra.* It is not necessary, however, to rest our decision only on this construction of the deeds. We think that there is to be found from all the evidence, including the deeds, an intent by Fenwick to bind all of the land in Poplar Hill by restrictions similar to those imposed, in substantial uniformity on each lot sold. We find, too, that the appellees bought with notice of the right of lot owners to require that this burden remain attached to the land, not only while in Fenwick's hands, but after the sale to one with notice, even though the restrictions were not expressly imposed on the lot so sold.

As a test of whether there is a common plan or scheme of development which permits the inference of intent that the restrictions were not for the personal benefit of the grantor, but rather for the common advantage and benefit of all who purchased from him, this Court has used the language of *Mulligan v. Jordan* (N. J.) 24 A. 543, at p. 544 (quoted in *Summers v. Beeler* and *Ringgold v. Denhardt,* both *supra*), that this inference is to be confined to cases "* * * where there has been proof of a general plan or scheme for the improvement of the property, and its consequent benefit, and the covenant has been entered into as part of a general plan to be exacted from all purchasers, and to be for the benefit of each purchaser, and the party has bought with reference to such general plan or scheme, and the covenant has entered into the consideration of his purchase." We find that the evidence in the case before us shows that all of these tests have been fully met. It is admitted that there was a general plan of development of all of Sections A and B from the time sales began. Some eighteen months later, Section C was opened. The same restrictions were imposed on all lots sold and

offered for sale there as had been, and continued to be, imposed in the two other sections, and with the opening of Section C, all distinction between the various sections was done away with. The restrictions were of a character used in highgrade, residential sub-divisions. The testimony of the owners that they bought believing the restrictions were applicable to all of Poplar Hill, that they would not have bought except for this belief, is convincing. The testimony of the sales agent that restrictions were a selling point, that a majority of the owners would not have bought except for them, and that the price paid was a reflection of the restrictions, has weight. Some of the deeds expressly said that the restrictions were part of the consideration of the purchase. The sign at the entrance to the property on the very lot here involved, that Poplar Hill was a restricted residential development, can only have reflected the belief of the developer that all of the tract was restricted and his intent to induce purchases in reliance on that fact. The use of the phrase "Poplar Hill restrictions" in the contracts of sale and in the conversation of salesmen indicated that all of the area was to be on the same footing. Fenwick himself gave specific reflection of this in writing on at least three occasions. In 1940, in one deed, he conveyed the property "subject to the usual and customary general restrictions *applicable to the development known as Poplar Hill*". (Emphasis supplied) In 1948, when there were purchased lots eighty-three, eighty-four and eighty-five in what had been Section C, the buyer, who was a lawyer, had added certain sentences to the customary contract of sale. When it was sent to Fenwick, he added, in pen and ink, the following words to the contract: "subject, however, to the restrictions applying to other lots in Poplar Hill, to be applied to each of the three lots separately. C. G. F." In returning the contract, he wrote a letter to Strobel in which he said: "Also, I think it important that we agree that the three lots should be reserved for three single one-family residences, with restrictions similar

to those put upon other lots in the development. It would not do for the lots to be subsequently resold and divided up in a way objectionable to the adjacent owners. I have added a clause to the contract to that effect." In 1948, also, lot eighty-seven, in what was Section C, was conveyed: "Subject to the legal operation and effect of, *and with the benefit of,* the restrictions" in a specified deed. (Emphasis supplied.) In addition, although the fact that Fenwick in many deeds reserved the right to waive certain of the restrictions for himself and his heirs and assigns, is not taken to be as decisive in showing there was an implied covenant that the part of the development retained by him was subject to the other restrictions, nevertheless, it certainly may be taken as evidence of intent that this is so. The same may be said of the deeds in which the covenants and restrictions and reservations were "entered into by the said party of the second part and the said party of the first part, for themselves, their respective heirs and assigns". *Middleton Realty Co. v. Roland Park Civic League, supra.*

The question which must be determined is the intent of the common grantor. All of the matters we have set forth are relevant in this connection. Chief Judge Bond said for the Court in *Schlicht v. Wengert,* 178 Md. 629, 634, in the absence of express promises in the conveyances that the restrictions were intended to be for the common benefit and advantage of vendees and subvendees: "* * * it is incumbent upon a party seeking enforcement to show an unexpressed intention by inference from the nature of the plan and development, and the purpose of the restriction, or, in other words from the circumstances. It would be incorrect to say that the absence of an expression of the intention is decisive. And *it would be incorrect to say that any ground of valid inference must be disregarded.* An inference which appears with sufficient clearness from any source should be accepted." (Emphasis supplied.) In *Williams Realty Co. v. Robey, supra,* at p. 539 of 175 Md., it was held

that intention: "* * * need not be found in the conveyance; a sufficiently clear manifestation in a previous agreement must have the same result." The Court continued that it is not always the purpose in the grantor's mind that must be carried out. "From expressions used, inducements extended, the law determines the rights and obligations, and not from subsequently disclosed mental operations to the contrary." In *Scholtes v. McColgan, supra,* it is reiterated that the intention is a question of fact, which may be indicated in different ways from all of the circumstances of the case. The Court, after deciding that certain facts, including other sales without restrictions, gave no evidence of a general plan, turned to oral declarations of grantor and a letter written by him, and found that they fell short of proof of an intention to adopt a general plan of restrictive development.

This is not a case where the only evidence of a general plan is the imposition of restrictions in each deed, which has been held insufficient. Here, the appellants have met the burden of proof as to a general plan of development by clear and satisfactory evidence. This being so, the principle that doubt must be resolved in favor of the alienability of land, free and unfettered, does not control. *Martin v. Weinberg, supra.* This rule of construction bows always to the more fundamental rule that wherever possible effect will be given to an ascertained intention of the parties. *Adams v. Parater, supra.* That several lots were conveyed without restrictions does not of itself negative an intent that there should be a general comprehensive plan, nor is it fatal to a finding that there was such a plan. *Adams v. Parater; Martin v. Weinberg; Schlicht v. Wengert; Snow v. Van Dam,* all above cited.

The appellees argue that even if the evidence supports the finding that there was a general plan of development, from which is to be inferred an intent that the restrictions should bind all of the land, whether sold or retained, this goes no further than to justify a holding that purchasers of restricted lots can enforce the restrictions *inter sese,* as in *Schlicht v. Wengert, supra,* and does not

justify an extension of the holding to include as restricted land sold without restrictions. They add that no Maryland case has ever " * * * defined and imposed a restrictive covenant by implication or by virtue of an oral undertaking or by acts in pais." Neither the statement as to the Maryland cases nor the broad contention as to the law generally will stand analysis. In *Peabody Heights Co. v. Willson,* 82 Md. 186, and *Williams Realty Co. v. Robey,* to which we have referred, the Court did, in substance and effect, exactly what the appellees say has never been done in Maryland. The right to do it has been repeatedly recognized by this Court. In *McKenrick v. Savings Bank, supra,* the law of the State is said to be that if the necessary intention that the restrictions are a part of the general plan "* * * which should affect the land granted and the land retained alike, they may be enforced in equity * * *." In *Scholtes v. McColgan, supra,* the suit was to restrain the common grantor from selling any part of the tract of land involved to any person of the negro race in violation of the covenant previously entered into with other purchasers. The right to relief was fully recognized, had the facts justified it, but it was held that intention to bind the whole tract was not shown. In 8 *Md. L. R. Restrictions Against Occupancy—Existence of a General Plan, supra,* 307 it said at page 310: "Conversely, where such an agreement on the vendor's part is found, [that the same restrictions should bind the retained land] a vendee may sucessfully maintain suit in equity to enjoin the sale of any of the land without such a restriction." Where restrictive covenants have not been enforced, it has been because of the facts, not the law. See, for example, *Ringgold v. Denhardt,* cited above. There it was found, or assumed, that the successor in title of the common vendor had the right to sell off lots without restrictions or to change the plan of development as he saw fit and as he had previously done. In *Oak Lane Corp. v. Duke,* 196 Md. 136, relied on heavily by the appellees, as is pointed out in *Middleton Realty Co. v.*

*Roland Park Civic League, supra,* it was found that there was nothing to show a common plan of development except restrictions in the deed for the lots sold, and the decision actually would seem to have turned on the fact that in the fifty year period, since the imposition of the restriction, there had been numerous violations which had been entirely disregarded by the neighboring home owners, whose lots were restricted.

The text writers and cases in England and the other States support the appellants and not the appellees. 3 Tiffany, *Real Property,* 3rd Ed., Sec. 860, p. 483, and Sec. 867, p. 503. In II *American Law of Property,* Sec. 9.30, p. 426, the author discusses the theory of implied reciprocal servitude, arising at the time of purchase of restricted land against the common grantor's remaining land, and said: "This theory is of particular importance where the common grantor, contrary to his understanding with the prior purchaser, fails to insert express restrictions in later sales of the remaining lands." In Sec. 9.33, p. 431, there is discussed the situation of a uniform plan of development with no express promise to earlier purchasers that lots sold later would be restricted, and the sale of lots without restrictions at a later date. It is said: "* * * the courts in several recent cases have recognized the existence of an implied reciprocal servitude against these remaining lots based upon the existence of the general plan." It may be added that this has been done in early as well as recent cases. They include: *Spicer v. Martin,* 14 App. Cas. 12; *In re Birmingham and District Land Co.,* 1 Ch. 342; *Tallmadge v. East River Bank,* 26 N. Y. 105; *Sanborn v. McLean* (Mich.) 206 N. W. 496; *Johnson v. Mt. Baker Park Presbyterian Church* (Wash.) 194 P. 536; *Allen v. City of Detroit* (Mich.) 133 N. W. 317; *La Fetra v. Beveridge* (N. J.) 199 A. 70; *Duester v. Alvin* (Ore.) 145 P. 660; *Parker v. Nightingale* (Mass.) 6 Allen 341; *Snow v. Van Dam* (Mass.) 197 N. E. 224; *Hisey v. Eastminster Presbyterian Church* (Mo.) 109 S. W. 60; *Bostwick v. Leach* (Conn.) 3 Day 476; *Ridley v. Haiman* (Tenn.) 47 S. W.

2d 750; *Lewis v. Gollner* (N. Y.) 29 N. E. 81; *Edwards v. West Woodridge Theatre Co.* (D. C.) 55 F. 2d 524; *Bimson v. Bultman,* 38 N. Y. S. 209. In the case last cited, the plan of restricted building, which required stone or brick houses, was given out by advertisement, signs, and otherwise. The developer conveyed a number of lots by deed containing restrictions. One deed was given without restrictions to a purchaser with knowledge of restrictive clauses in other deeds. The suit was to enjoin the erection of a frame building. The Court said: "The principle which supports the judgment in this action is that, where an owner of land contracts with the purchaser of successive parcels in respect to the manner of the occupation and improvement of such parcels, he thereby affects the remainder of the land with an equity which requires it also to be occupied and improved in conformity to the general plan, and this equity is binding upon a subsequent purchaser of the remaining parcel, who has notice of the prior agreement, though his legal title be unrestricted."

On the matter of notice, we think it clear that Bushman, who took from Fenwick, and the appellees, who took from Bushman, both did so with notice, both actual and constructive, of the equity or implied servitude which bound all of Poplar Hill, including that still owned by Fenwick. Bushman was a salesman for Strobel, the general sales agent, and fully familiar with Poplar Hill. As part of the same transaction in which he purchased the lot here involved, he purchased three restricted lots in what had been Section A. His explanation as to why he thought the lot of the appellees could be transferred without restrictions was that it was not in Poplar Hill. This unexplained assumption has already been seen to be unwarranted. One of the appellees had worked for a cleaning establishment on Falls Road, a block or so away from the west entrance to Poplar Hill. He was a driver-salesman for eleven years, from 1940 to 1951. He was familiar with all of the roads in Poplar Hill. He had customers on all of them and knew exactly where the

development was. He went in there about four times a week. He must have driven towards and by the sign on the very lot he later purchased, which advertised Poplar Hill as a highly restricted development, several thousand times. He claims he did not ever see it. The other appellee has been in business in the neighborhood near the west entrance of Poplar Hill for about three years. He goes through the development every day going to and from work. A fact which at least arouses the necessity for inquiry was the title company report on the lot involved, which, in the first instance, indicated that it was subject to Poplar Hill restrictions. Subsequently, the title company was persuaded to make its guarantee absolute. Nevertheless, the appellees were put on notice by this action of the title company. Had they inquired, they would have found from the residents of Poplar Hill that all of them considered all of Poplar Hill restricted. As was said in *Sanborn v. McLean, supra,* (p. 498 of 206 N. W.) : "Considering the character of use made of all lots open to a view by Mr. McLean when he purchased, we think he was put thereby to inquiry, beyond asking his grantor, whether there were restrictions. * * * He could not avoid noticing the strictly uniform residence character given the lots by the expensive dwellings thereon, and the least inquiry would have quickly developed the fact that lot 86 was subjected to a reciprocal negative easement * * *."

In addition to actual notice, we think that the land records afforded constructive notice of the restrictions applicable to all of Poplar Hill. There are decisions holding that constructive notice is afforded only by a warning in the direct chain of title of the lot involved. *Hancock v. Gumm* (Ga.) 107 S. E. 872; *Buffalo Academy of Sacred Heart v. Boehm Bros.,* (N. Y.), 196 N. E. 42, 45. On the other hand, the decision in the New York case was qualified, the Court saying that its holding was: "* * * in the absence of exceptional circumstances, the consideration of which we may well leave until they arise." The Court may have been thinking of the Penn-

sylvania case of *Finley v. Glenn,* 154 A. 299, where the action was to enjoin violation of building restrictions and the Court held that restrictions referred to in deeds from the same grantor of other lots gave constructive notice to the purchaser. This Court has agreed with the Pennsylvania Court. *Lowes v. Carter,* 124 Md. 678. We think that constructive notice was afforded by the land records which showed: (1) the substantially uniform restrictions placed on each lot sold in the development; (2) the deeds in which Fenwick entered into the covenants for himself, heirs and assigns; (3) the deeds reserving to Fenwick, his heirs and assigns, the power to waive or change certain of the restrictions "as to any part of said tract then owned", from which can be implied a covenant that the remaining restrictions could not be waived as to "any part of said tract". The validity of our conclusion on this point is not weakened by the assumption of the title company, in the first instance, that Poplar Hill restrictions covered the lot involved.

The Mayor and City Council of Baltimore and its building inspection engineer were made parties after suit was instituted, to prevent excavation of the lot, which had been begun in violation of the building code. They answered, claiming no intention to grant a permit for unlawful excavation, and were dismissed without prejudice to the filing of a new bill, if need arose. This, we think, was proper. The decree dismissing the bill is reversed and the case remanded for the passage of a decree declaring that the lot of the appellees is subject to Poplar Hill restrictions and enjoining its use in violation thereof.

> *Decree reversed, appellees, other than M. & C. C. of Balto., and Paul A. Cohen, to pay the costs, and case remanded for passage of a decree in conformity with the views expressed herein.*

COLLINS, J., filed the following dissenting opinion.

The appellants contend that the lot in question and all of the finger or strip of land, hereinafter designated as the strip, is a part of the Poplar Hill Development. The strip was included in the deed of July 7, 1927, by Gilbert to Fenwick, and in the plat recorded at the time of the conveyance. On the Sutton-Britcher plat none of Section C is divided into lots and numbered, although all of Sections A and B are so divided and numbered. In fact, on none of the plats either recorded or offered in evidence has the strip been divided into lots and numbered. The appellants further contend that Fenwick subjected all land in Section C, including the strip, to Poplar Hill restrictions as part of a general plan of development for the mutual benefit of all the lot owners in Sections A, B and C. All of the deeds to lots in Section C, except those to lot No. 86 now owned by one of the appellants, and to the strip if in Section C, contain specific restrictions against commercial use. It is stipulated that there are thirteen deeds which contain the reservation that the restrictions therein would not bind the remaining land of the grantor.

The appellants also contend that the appellees had actual notice of restrictions on their lot. They rely on the fact that a sign was erected on the lot in question in 1929 and remained there for many years, which read "Poplar Hill". Underneath were the words "a restricted residential development." They also rely on the fact that sales plats were distributed to the same effect, and on the close personal contact of the appellees, in their cleaning business in the vicinity, with the residents of Poplar Hill. However, the appellees testified that they did not see the sign and that they received no information that their lot was subject to restrictions. The chancellor saw and heard the witnesses. We cannot say he was clearly wrong in finding no actual notice. Appellants also rely on the fact that at the time the lot in question was purchased, the Maryland Title Company expressly excepted from the effect of the policy the

"Poplar Hill Restrictions". However, we must note that that title company later amended the policy without any restrictions. It is hardly likely that the appellees, intending to build a commercial property on the lot conveyed, would have bought the lot if they had actual notice of restrictions against such construction. That they had actual notice is certainly at least doubtful and any doubt should be resolved in favor of the unrestricted use of the property. *Matthews v. Kernewood, Inc.*, 184 Md. 297, 40 A. 2d 522; *Scholtes v. McColgan*, 184 Md. 480, 41 A. 2d 479; *Oak Lane Corporation v. Duke*, 196 Md. 136, 75 A. 2d 80.

As to constructive notice to the appellees of the restrictions, the appellants rely on what they claim is a uniform plan of development throughout Poplar Hill. They rely strongly on approximately four deeds to particular lots in Section C and approximately six deeds to particular lots in Section B which contained substantially the following: "Subject, however, to the following covenants, agreements, restrictions, reservations and easements which are hereby entered into by the said parties of the second part and said party of the first part, for themselves, their respective heirs, successors and assigns." Some of these deeds to particular lots in Section B contained the clause: "Subject to the usual and customary general restrictions applicable to the development known as Poplar Hill * * *." Appellants contend that, although these deeds were of particular lots, these placed restrictions on all of the Fenwick property and not alone on the land thereby conveyed by the particular deeds. They point to the Rianhard deed aforesaid in which there were ten restrictions. Restriction No. 9 contained the following: "Similar restrictions with the exception of the set back of the garage from the front line which set back may be fifty feet if plans are approved to that effect by the party of the first part shall apply to all lots to be laid out in Section A of the plat of Poplar Hill recorded or intended to be recorded among the Land Records of Baltimore City prior hereto but shall not apply to the

remaining property belonging to the party of the first part." Restriction 9A contained the following: "The party of the the first part, his heirs, assigns or personal representatives hereby expressly reserves the right at any time to change or modify any of the restrictions, conditions, covenants, agreements or provisions contained in Nos. 4, 5 and 6 hereof as to any part of said tract then owned by the party of the first part, his heirs, assigns or personal representatives." A clause similar to 9A was also included in deeds to other lots in Sections A and B. The appellants contend that this language shows a uniform general scheme or plan of development and use which affects not only the land granted but also the land retained by Fenwick. They contend that because Fenwick reserved the power to change paragraphs 4, 5 and 6, that paragraphs 1, 2 and 3, which prohibit commercial establishments, were thereby imposed on all the land owned by Fenwick including the strip. If the restrictions were so imposed, it was at the most by a very indirect manner by inference.

The appellants also rely strongly on the deed of July 29, 1948, from Fenwick to Baldwin of Lot No. 87 in Section C, which placed the same restriction on that lot as in a former deed from Fenwick to Ingraham. The Baldwin deed contained the following: "Subject to the legal operation and effect of, and with the benefit of, the restrictions contained in a deed from the said Charles G. Fenwick, unmarried, to Aileen Dammann Ingraham, dated June 15, 1928 * * *." The Ingraham deed contained the following: "Similar restrictions with the exception of the set back of the garage from the front line which set back may be forty feet if plans are approved to that effect by the party of the first part shall apply to all lots to be laid out in Section 'A' * * *." Appellees contend that because the Baldwin deed was in Section C, that Section A in the Ingraham deed should be interpreted to be Section C and that such was the intent of the parties. If the Baldwin deed intended to put restrictions on all of Section C, it would have been very easy

to do so. That such was the intent is at least doubtful.

The appellants rely on the case of *Lowes v. Carter,* 124 Md. 678, 93 A. 216, where a mortgage failed to mention any restrictions on the property covered thereby. However, in that case, deeds to the other lots in the development declared that each and every one of the lots should be subject to all of the restrictions whether the said lots should be sold or retained by the grantor. There is no such statement in any of the deeds here as to Section C.

The appellants stress the following quotation from *Schlicht v. Wengert,* 178 Md. 629, 635, 15 A. 2d 911: "If the restrictive covenant appears to have been adopted for the uniform development of the tract, as part of a general scheme, the unexpressed intention may be evident, and the covenant may be enforced at the suit of a neighboring owner aggrieved by its breach. *McKenrick v. Savings Bank,* 174 Md. 118, 128, 197 A. 580, 584. 'If in such a case it appears that it was the intention of the grantors that the restrictions were part of a uniform general scheme or plan of development and use which should affect the land granted and the land retained alike, they may be enforced in equity'." That case involved a subdivision of 210 lots in Anne Arundel County. There were restrictive covenants in all the deeds except two against the sale of beer. The appellee, Wengert and wife, held their lots under three deeds, one from Tubman and Mace contained the covenant in full, and two, from vendees of Tubman and Mace, adopting it by express reference. In the instant case, no restrictions are contained in the deed in question. In the *Schlicht* case, Wengert sold beer on this property. Out of friendship for Wengert, Schlicht, owner of a neighboring lot, had tolerated the alleged violation for about five years. The Court there found: "On the main question, whether the covenant in the Wengert deed was intended for the benefit of other vendees in the tract, the conclusion of this court has differed from that of the court below. One large tract was being developed by division into lots for sale, a printed, uniform, deed was prepared and used for all, with the two exceptions men-

tioned, and the covenant on its face seems to evidence a design to give a character to the whole neighborhood, that is, to secure a residential neighborhood, free from occupations and structures which might disturb that character, 'at any time hereafter.' A uniform, general, scheme of development and use was adopted, and the benefit and advantages of the covenant seem plainly intended for buyers of other lots; after all the lots were sold, as the plan intended, it could benefit only the buyers and their assigns. Many residences have been built, and there is testimony that the complainants, at least, built in reliance on the assurance as to the character of the place." In the instant case the plats are not uniform and there has been shown no uniform plan of development for the strip. Although it was stipulated that residents in Poplar Hill would testify that they purchased their properties "in reliance upon some restrictions being applicable to Poplar Hill," there is no agreement as to just what land was covered by the restrictions. In fact, the appellants in their brief say as to the Somer's parking space, which is a part of the strip and within approximately three hundred feet of the lot in question: "Few of the residents of Poplar Hill knew that this southernmost portion used by Somers as a parking space, was part of Poplar Hill. * * * Furthermore, none of these appellants wish any harm to Somers, whose store does no harm to Poplar Hill * * *." Although failure of the appellants to proceed against Somers for violations of alleged restrictions may not constitute laches, it is strong evidence that the strip, the lots of which were not numbered or subdivided on the plats, was never considered a part of the Poplar Hill Development or a part of the uniform scheme of development.

As to the contention that the covenant by Fenwick, in placing restrictions on particular lots, placed restrictions on all the Fenwick property, appellants rely on the following quotation from *Raney v. Tompkins,* 197 Md. 98, 101, 78 A. 2d 183: "It appears to be well settled that 'a grantor may impose a restriction, in the nature

of a servitude or easement, upon the land that he sells or leases, for the benefit of the land he still retains; and if that servitude is imposed upon the heirs and *assigns* of the grantee, and in favor of the heirs and assigns of the grantor, it may be enforced by the assignee of the grantor against the assignee, with notice, of the grantee.' *Halle v. Newbold,* 69 Md. 265, 270, 271, 14 A. 662, 663. The same principle applies where the condition is imposed upon the land retained in favor of the land sold." However, it was said in *Wood v. Stehrer,* 119 Md. 143, 148, 149, 86 A. 128: "The covenant does not provide that the grantors will use or hold the remainder of the property subject to the same restrictions imposed on the lot conveyed to the appellant. There is nothing in it which would have prohibited the grantors from erecting such improvements as Stehrer was about to erect. If it was intended to attach to the land remaining in the grantors the restrictions, conditions and limitations imposed on the lot conveyed to appellant, surely it would have been so stated, but they only covenanted that 'they will not grant, convey, assign or lease any of the ground,' etc., except under and subject to the aforesaid restrictions, etc. As the covenant does not attempt to regulate the *use* of the remaining property by the grantors, and does not bind or refer to their heirs and assigns, it is not to be presumed that it was intended to include them." It was also said in *Bealmear v. Tippett,* 145 Md. 568, 571, 125 A. 806: "The essential inquiry is whether there is any existing interest on behalf of which the restrictive covenants we have mentioned can be enforced in regard to the property with which we are concerned in this case. In order to answer that inquiry in the affirmative we should have to discover in the terms of the deeds, or in satisfactory proof of a uniform plan of development, an intention that the covenants should bind all portions of the land. *Beetem v. Garrison,* 129 Md. 664. The provisions of the deeds failed to reveal such a purpose. They omit any agreement that the restrictions should bind the grantor's remaining land, or should apply to property

other than that granted in each instance, and the covenants on the part of the grantor, in every deed, are strictly individual. *Safe Deposit Company v. Flaherty,* 91 Md. 489; *Wood v. Stehrer,* 119 Md. 143; *Lowes v. Carter,* 124 Md. 678." See also *Kleis v. Katcef,* 160 Md. 627, 631, 154 A. 558.

Fenwick undoubtedly directly placed restrictions on all of Sections A and B. If restrictions are placed against all of Section C and the strip, it can be done only on the theory that such restrictions are created by equitable servitude. The doctrine of equitable servitude apparently originated in this State with the case of *Thruston v. Minke,* 32 Md. 487, as assumed in *Ringgold v. Denhardt,* 136 Md. 136, 141, 110 A. 321, and *McKenrick v. Savings Bank,* 174 Md. 118, 121, 197 A. 580. In the *Thruston* case, *supra,* Thruston and Minke owned as tenants in common a lot of ground in Cumberland, a part of which was improved by the St. Nicholas Hotel. Thruston leased to Minke for a term of ninety-nine years, renewable forever, his undivided interest in the vacant or unimproved part of the lot. In that lease were express restrictions authorizing the use of the hotel wall up to the third floor level for an adjoining building, and prohibiting the construction of any building on the vacant part higher than the level of the third floor of the hotel. As in the instant case with respect to the lot in question, there was no language as to these restrictions running with the land for the benefit of the lessor's remaining land. Thruston sold the ground rent and reversion created, but retained the hotel property. Thereafter Minke violated the restrictions. In an action for an injunction this Court found that the written contract, although not expressly so providing, was clearly for the benefit of the hotel. Being written and recorded it constituted an equitable servitude enforceable by Thruston as the hotel owner. This in no way involved the Statute of Frauds as the contract was in writing and recorded. The language in the restrictions on the specific lots in the instant case is by no means so clearly made for the

benefit of the remaining land of Fenwick, not specifically restricted. See *Scholtes v. McColgan,* 184 Md. 480, 41 A. 2d 479, VIII *Md. L. Rev.,* page 307, where it was held that the filing of a plat without restrictions on it does not indicate the adoption of any uniform restricted plan of development, but that the absence of a plat may indicate the lack of a plan. See also *Matthews v. Kernewood, Inc.,* 184 Md. 297, 40 A. 2d 522. The appellants rely on the following quotation in *Ringgold v. Denhardt, supra,* from *Nottingham Brick & Tile Co. v. Butler,* 15 Q. B. Div. 268, that, if the restrictions "are meant for the common advantage of a set of purchasers, such purchasers and their assigns may enforce them *inter sese* for their own benefit." In the instant case the restrictions imposed by Fenwick are not entirely uniform in Section C. Different expiration dates were imposed. There are several different plats. In some of the deeds, as hereinbefore pointed out, the grantor reserved the right to change certain restrictions. In *Ringgold v. Denhardt, supra,* it was said: "Mr. Ringgold was asked: 'Now, as a matter of fact, was not it originally intended by you that the property now called the church lot, as well as lot B and D, to the extreme rear or eastward end of the development, should be part of the development?' and he made this significant reply: *'We had it plotted out. We could not tell you what we were going to do. Many changes are made in a plat.'* If the vendor had the right to sell off lots without imposing restrictions, and to make changes in the plat as she saw proper, it cannot be said that it was the intention of the parties that her remaining property was to be subject to the restrictions." In the case of *Oak Lane Corporation v. Duke,* 196 Md. 136, 75 A. 2d 80, in each deed, unlike those in the case now before us, similar restrictions were included. None of the deeds contained any statement that similar restrictions bound the lots retained, or subsequently to be sold by the developing company. It was there said: "Where restrictions are imposed upon property sold for the benefit of the property retained, and

upon the property retained for the benefit of the property sold, or upon both for the benefit of both, such restrictions are held to constitute a uniform general scheme or plan of development, to run with the land, and to be valid and enforceable. *McKenrick v. Savings Bank,* 174 Md. 118, 197 A. 580. Such restrictions may be shown otherwise than by the deeds, if there is clear and satisfactory proof that the common grantor intended that they should affect the land retained. [*Williams Realty Co. v. Robey,* 175 Md. 532, 2 A. 2d 683]. This is a question of fact which may be considered from all the evidence produced in the case. Any doubt should be resolved in favor of the unrestricted use of the property. *Scholtes v. McColgan,* 184 Md. 480, 41 A. 2d 479. There is nothing in the case before us which indicates any common scheme, except the restrictions in the deeds of the lots sold. The Park Manor Realty Company did not obligate itself to convey all of the lots in the plat with these restrictions on them when it acquired the property in 1907, and subdivided it, and started to sell lots."

It was said in *Matthews v. Kernewood, Inc., supra:* "Implied restrictions have never been favored by this Court. It was said in the case of *Baltimore Butchers Abattoir & Livestock Co. v. Union Rendering Co.,* 179 Md. 117, at page 123, 17 A. 2d 130, at page 133: 'It is also a fundamental rule that since restrictions are in derogation of conveyances and repugnant to trade and commerce, restrictive covenants are not favored by the Courts. but should be strictly construed against the parties seeking to enforce them. [*McKenrick v. Savings Bank, supra.*] A restrictive covenant should not be extended by implication beyond its original intent to include anything not clearly expressed in the conveyance, and if there is ambiguity in its meaning, any doubt should be resolved in favor of the unrestricted use of the property, if it reasonably can be done. The burden rests upon the party relying on a restrictive covenant to bring himself within its terms.' [*Clem v. Valentine,* 155 Md. 19, 141 A. 710; *Levy v. Dundalk Co.,* 177 Md. 636, 648, 11 A. 2d 476] * * *

Even if language used to express a restrictive covenant involves a doubt as to construction, the rule is that such covenants are to be construed strictly against those seeking to enforce them and all doubts must be resolved in favor of the natural and free use of the property. *Bartell v. Senger,* 160 Md. 685, 693, 155 A. 174; *Himmel v. Hendler,* 161 Md. 181, 187, 155 A. 316; *Ferguson v. Beth-Mary Steel Corp.,* 166 Md. 666, 672, 172 A. 238; *McKenrick v. Savings Bank,* 174 Md. 118, 128, 197 A. 580; *Yorkway Apts. v. Dundalk Co.,* 180 Md. 647, 650, 26 A. 2d 398; *Gulf Oil Corp. v. Levy,* 181 Md. 488, 30 A. 2d 740."

In the instant case, the strip of which the lot in question is a part, is not subdivided or numbered on any of the plats filed or offered in evidence. The strip touches only one lot of Section C, being separated from Section C on the north by Bellemore Road and bounded on the east by Falls Road, on the south by the lot still owned by Fenwick which is not restricted, and on the west by the Penniman land and lot 79. There is not a single deed here which expressly binds all land retained by Fenwick. In fact the Rianhard deed, *supra,* the first deed from Fenwick, and thirteen other deeds, expressly provided that the restrictions should not apply to the remaining Fenwick land. No search of the records of the land, conveyed to Fenwick, would reveal any restrictions on appellee's land. *Hancock v. Gumm,* (Ga.), 107 S. E. 872; *Buffalo Acad. of Sacred Heart v. Boehm Bros.,* 276 N. Y. 242, 196 N. E. 42, 45; *Finley v. Glenn,* 303 Pa. 131, 151 A. 299; *Lowes v. Carter, supra.* See *Limits of Record Search and Notice,* 93 Univ. of Pa. Law Review 125, 171-175. The title company evidently reached this conclusion. The majority opinion in this case holding that the restrictions apply to the lot in question goes much further than any previous decision of this Court. The facts and language relied on for the restrictive covenants here are certainly not free from doubt. There is testimony here from experts that the lot upon which appellees intended to build the cleaning establishment,

zoned commercially, could not be used for residential purposes, it being very precipitous. The view across Falls Road is not that desired in a residential area. The lot can be seen from only a few homes in the development. If the intent existed to put the restrictions on all of Section C, including the strip, it would have been easy to do so in the same manner in which the restrictions were unquestionably placed on Sections A and B. *Brady v. Farley*, 193 Md. 255, 66 A. 2d 474. This method was not followed. The writer is of the opinion that the strip of land here is not included in any general scheme of development and that the decree should be affirmed.

*Decree reversed, appellees, other than M. & C. C. of Balto. and Paul A. Cohen, to pay the costs, and case remanded for passage of a decree in conformity with the views expressed herein.*