MICHAEL B. SCHOLTES *v.* CHARLES G. McCOLGAN

[No. 23, January Term, 1945.]

*Decided March 2, 1945.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, MELVIN, HENDERSON, and MARKELL, JJ.

*James C. Burch* and *H. Richard Smalkin*, with whom were *Smalkin & Hessian*, on the brief, for the appellant.

*Richard H. Stevenson* for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

The appellant is the owner of two lots on the Falls Road in Baltimore County, which were purchased by him in March, 1940, and in January, 1942, both from the appellee. In each of his deeds is found the following clause: "The property above described or any building thereon shall at no time be occupied by any Negro or any person of Negro extraction; this restriction however, is not intended to include the occupancy by any Negro domestic servant while employed in or about the premises by the owner or occupant of the property."

Appellant's lots were part of a tract of about 74 acres, conveyed without restrictions to the appellee in 1903. The appellee has sold only five lots out of this tract in the 40 odd years since he purchased it, two of these being those sold to the appellant. One lot was sold to the Board of Education of Baltimore County, was conveyed without restrictions, and now is used as part of a white school yard. Another lot was sold September 18, 1939, to Warren B. Sayman. In this transaction there was first an option given, subject to certain restrictions, one of which was also placed in the deed. This restriction reads: "The premises shall not be leased, sold, demised or conveyed to or owned by a Negro; or be occupied or resided on by persons of Negro descent, except in a menial capacity." At the end of the list of restrictions attached to the option, it is stated: "The restrictions above mentioned are not to bind or apply to any other property of the vendor, except there herein described." The last tract sold, other than the final one sold to appellant, was conveyed in February, 1941, to Edward E. Stafford and wife. The Stafford deed contains the same restriction as that in the deeds of the appellant.

The bill of complaint alleges that at the time appellant purchased his lots, he was advised by the appellee that no part of the 74-acre tract could ever be sold to, or occupied by, persons of the Negro race; that he has erected a valuable dwelling house and a shop on the lots purchased by him, which he now occupies; that he is a member of the white race, and relied upon the assertion of the appellee, especially in view of the fact that a Negro settlement was situated on the same side of the Falls Road as the lots he purchased. Appellant further alleges that the appellee wrote to appellant's agent on May 3, 1944, advising him that he had sold a stone dwelling, situated at or near the northeast corner of Falls Road and Sorrento Avenue, and on a part of the 74-acre tract, to persons of the Negro race. Appellant asks that appellee be restrained from selling this dwelling to persons of the Negro race, be restrained from permitting and allowing any person of the Negro race to occupy the said building, that he be restrained from conveying to any person of the Negro race any part or parcel of the 74-acre tract, and that he be restrained from permitting any person of the Negro race to occupy any part of the said tract, and for further relief. Appellee, in his answer, denies the allegations that he made any statements that no part of the 74-acre tract would ever be sold to or occupied by persons of the Negro race. He further states that the Negro settlement mentioned in the bill is located approximately 50 feet from the boundary of the 74-acre tract. He also states that the covenant against Negro occupancy, contained in the Stafford deed, has been waived by the Staffords and the appellee by mutual consent in writing. Testimony was taken, and at the conclusion of the case, the Chancellor dismissed the bill of complaint. From the order dismissing the bill, this appeal comes here.

The letter of May 3, 1944, written by the appellee to appellant's agent, Mr. Fenton, who was trying to buy a lot from appellee for appellant, was offered in evidence by appellant for the purpose of showing appellee's intention. The pertinent parts of this letter are as follows:

"Over 40 years ago I purchased 75 acres of land on both sides of the Falls Road just north of the colored settlement which stopped the extension of the colored development. During all these years, since that time I made an effort, but in vain, to sell to white people only. Finding that it was impossible, I offered this property on the market for manufacturing purposes and succeeded through brokers in selling to Scholtes and The Valley Landscape Company. Then came along Mr. Arthur F. L. Briscoe, who no doubt you know, who is related to the Lee and Tyson families. I sold him eight (8) acres for a night club. The reason for buying the large acreage was for parking space facilities, so the Falls Road would not be congested, he proposed to put up a building to accommodate 3,000 people with a dance floor large enough for 1,000 couples. No whiskey was to be sold but beer, light wines and sandwiches. People up the road including Johnson who is more than two (2) miles away, with the Valley Inn adjoining his property which has dog racing in the summer and sells whiskey and all kinds of liquors—also Mr. Allen W. Morton 2½ miles away by road to his entrance and 65 other residents from Ruxton and surrounding country succeeded up to the present in keeping Mr. Briscoe from obtaining a license, although the property was zoned for business.

"Feeling that the residents have not appreciated my efforts during the past 40 years, I then determined to sell it to Negroes or anybody and have succeeded in selling the stone building facing the school campus and several lots to colored people—so Kelly and his dogs will have to find another location.

"I do not believe I will have any trouble in selling the balance of the property to Negroes, where they can enjoy boating, fishing and skating on Lake Roland with the other 65 residents."

Appellant testified that when he bought the first lot in 1940, he had a conversation with appellee and the latter told him at that time "He had restricted this property and didn't want the darkies to come in further than they

had come at the present time, and that was his intention." On the strength of that, and the clause in the deed, appellant claimed he erected his home because he thought he was protected. Later, on re-cross examination, being asked to clarify this conversation, he said that the appellee said he didn't want any colored people on his property, and was inserting a clause in appellant's deed which would keep him from ever selling to any colored people, or renting to them. Mr. Sayman, one of the other lot owners, said he had a conversation with the appellee about 18 months before he actually purchased his property, at the time he rented it with an option. He said the appellee told him that he didn't want any Negroes on the place, and that there would be a restriction in reference to that. He said that the appellee intended to keep it all as a white subdivision and restricted the Negroes to the territory where they were at the time. He was asked on cross examination to explain the provision in the restrictions that they were not to bind or apply to any other property of the vendor except that described. He gave his interpretation of that provision as meaning some other tract than the 74-acre tract, but it is probable from the way he gave his testimony that he had not read it.

A Mrs. Kelly, who is engaged with her husband in the dog kennel business, and formerly occupied the stone house, said that the appellee had rented this house to her more cheaply than he could have rented it for a store; that he said he could have rented to colored people for a store, but that he didn't want to; that he had paid taxes on the property and kept it idle, and also he had kept a little bungalow idle for a number of years because he wouldn't rent to colored people.

The appellee denied that he had ever told the appellant that he never intended colored people to occupy any portion of his 74-acre tract. As to the Sayman sale, he testified that he had told Sayman at the time the latter got an option, that he was not tying up other property except Sayman's, but that he did tell Sayman that he never

intended colored people to occupy any portion of the 74-acre tract. He said that adjoining the 74-acre tract there were about 22 colored families, all but two located on the west side of Falls Road. After the night-club sale did not go through as set out in the letter, the appellee said he then decided to sell to colored people; that since 1903 he has not been able to sell any lots for exclusive white residences on the 74-acre tract. The Sayman, Scholtes, and Stafford properties are business. A Mr. Ferguson, who had been in the real estate business for a great many years, testified that he was familiar with the 74-acre tract; that it is underlined with stone and has very steep gulleys and holes, and is decidedly not suitable for residential development.

Other testimony was taken, but none of it is particularly pertinent to the issues which the appellant raises. These are: (1) That it was the intention of the appellee to impose a restriction against the sale to and occupancy by Negroes on the land sold to the several grantees, including the appellant, as well as against the land retained by the appellee as a part of a general plan or scheme for the development of the land. And, (2), that it was the intention of the appellee to impose such restrictions upon the land sold to the several grantees, as well as upon the land retained by him, for the benefit of the land conveyed to the grantees, as well as for the benefit of the land retained, and that the restrictions are enforceable by and against the several grantees and the land conveyed to them, as well as by and against the appellee and the land retained by him, despite the absence of a general scheme of land development.

It may be noted at the outset, that the specific prayer of the bill of complaint and the contentions made by the appellant go farther than the restrictions in his deeds. He asks that the appellee be enjoined from selling land to persons of the Negro race and also from permitting such persons to occupy any of the land. The restrictions in his deed relate only to the occupany of the land by persons of the Negro race. There is a well-defined dis-

tinction between the two kinds of restrictions. In 14 Am. Jur., "Covenants, Conditions and Restrictions," par. 208, p. 618, we find the statement: "In the consideration of whether restrictive covenants or conditions discriminating against persons on account of race, color, or religion violate the rule forbidding restraints upon alienation, a distinction must be drawn between a covenant or condition which binds the grantee not to transfer or convey the property to certain classes of individuals and one which binds him not to permit the property to be occupied by them. All courts agree that a condition or covenant that property shall not be occupied by persons of certain races is not invalid as a restraint upon the alienation of the property, whereas, according to one line of authorities, a covenant forbidding the sale of the property to persons of a designated race is void as a restraint upon alienation, even though the restrictions by its terms exists only for a limited period." In the case of *Meade v. Dennistone*, 173 Md. 295, 196 A. 330, 335, 114 A. L. R. 1227, where this Court was considering the validity of an agreement between property owners barring out all occupancy of their property by persons of African descent and providing that any sale or transfer should be subject to such restrictions, it was said: "The weight of authority is that a total restraint on alienation, for an unlimited time, to a limited class, is void, though there is a difference of opinion whether time can affect the question of the application of the rule. *Mandlebaum v. McDonell*, 29 Mich. 78, 18 Am. Rep. 61. The rule is founded on the theory that such restraints take property out of commerce, and we have decided in this state that conditions or limitations in restraint of alienation cannot be validly annexed to a grant or devise of an estate in fee, *Clark v. Clark*, 99 Md. 356, 58 A. 24, unless the property is put in trust, *Gerke v. Colonial Trust Co.*, 114 Md. 289 [290], 79 A. 587. * * * The rules against restraints on alienations were only intended to make conveyancing free and unrestrained, and had nothing to do with use and occupancy. It may be an

anomalous situation when a colored man may own property which he cannot occupy, but, if he buys on notice of such a restriction, the consequences are the same to him as to any other buyer with notice. There is no law which forbids the property owners to agree that any given territory shall be all white or all colored." It is obvious that the only possible enforceable restriction on the use of the land in question, in this case, is that it shall not be occupied by Negroes or persons of Negro extraction except when employed as domestic servants. The most that the appellant could obtain would be an injunction preventing the appellee from selling his land without putting such restrictions in the deeds of any part sold. The question, therefore, narrows to whether he is entitled to this.

There have been many cases in this Court dealing with restrictions on land. In *McKenrick v. Savings Bank,* 174 Md. 118, 197 A. 580, 584, Judge Offutt, in an exhaustive opinion, reviewed 19 earlier cases and summed up the law from these cases as follows: "That one owning a tract of land, in granting a part thereof, may validly impose upon the part granted restrictions upon the use thereof, for the benefit of the part retained, and upon the part retained for the benefit of the part granted, or upon both for the benefit of both; that, where the covenants in the conveyance are not expressly for or on behalf of the grantor his heirs and assigns, they are personal and will not run with the land, but that, if in such a case it appears that it was the intention of the grantors that the restrictions were part of a uniform general scheme or plan of development and use which should affect the land granted and the land retained alike, they may be enforced in equity; that covenants creating restrictions are to be construed strictly in favor of the freedom of the land, and against the person in whose favor they are made; and that the burden is upon one seeking to enforce such restrictions where they are not specifically expressed in a deed to show by clear and satisfactory proof that the common grantor intended that

they should affect the land retained as a part of a uniform general scheme of development." Other late cases are *Levy v. Dundalk Co.*, 177 Md. 636, 11 A. 2d 476; *Schlicht v. Wengert*, 178 Md. 629, 15 A. 2d 911; *Baltimore Butchers Abbattoir & Live Stock v. Union Rendering Co.*, 179 Md. 117, 17 A. 2d 130; *Whitmarsh v. Richmond*, 179 Md. 523, 20 A. 2d 161; *Yorkway Apartments v. Dundalk Co.*, 180 Md. 647, 26 A. 2d 398; *Gulf Oil Corporation v. Levy*, 181 Md. 488, 30 A. 2d 740, and finally *Matthews v. Kernewood*, 184 Md. 297, 40 A. 2d 522.

The intention of the parties is a question of fact. *Summers v. Beeler*, 90 Md. 474, 45 A. 19, 48 L. R. A. 54, 78 Am. St. Rep. 446, quoting *Nottingham Brick and Tile Co. v. Butler*, 15 Q.B. Div. 268; *Foreman v. Sadler's Ex'rs*, 114 Md. 574, 80 A. 298; *Peabody Heights Co. v. Willson*, 82 Md. 186, 32 A. 386, 1077, 36 L. R. A. 393; *Clem v. Valentine*, 155 Md. 19, 141 A. 710; *Fitzsimmons v. South Realty Co.*, 162 Md. 108, 159 A. 111; *Schlicht v. Wengert*, 178 Md. 629, 15 A. 2d 911; and *Whitmarsh v. Richmond*, 179 Md. 523, 20 A. 2d 161. The intention to adopt a general plan of development with restrictions may be indicated in different ways. When it is intended to adopt such a general plan, the simplest method is to include all of the restrictions in every deed, and to state that they bind not only the property conveyed, but also the property retained, and that they are placed upon the property for the benefit of the owners of all parts of it. The mere filing of a plat without restrictions on it does not indicate the adoption of any uniform restricted plan of development. *Matthews v. Kernewood, supra.* The absence of a plat may be evidence that no general plan of development was contemplated. Testimony is admissible that the owner of the property at the time he sold lots from it, held out to the purchasers that the whole tract would become a restricted area, and that the purchasers relied on his statements. In other words, the whole question becomes a question of fact, to be determined from all the circumstances in the case. In its consideration, there must be borne in mind the often re-

peated doctrine that doubts should be resolved in favor of the unrestricted use of property. *Baltimore Butchers Abbatoir & Live Stock v. Union Rendering Co.,* 179 Md. 117, 17 A 2d 130, supra; *Matthews v. Kernewood,* supra.

In the case before us there was no plat prepared and filed, and there was no general plan of development publicly advertised, either with or without restrictions. In the case of the Sayman sale, as we have already shown, there was a list of restrictions furnished Sayman at the time he was given the option, but this list specifically says that these restrictions are not to bind or apply to any other property of the appellee, except that on which Sayman was given an option. The lot was conveyed to Sayman by a deed which contains, not only the restrictions against occupancy, but the invalid and unenforceable restrictions against sale. The deed to the property sold to the Staffords contains the same restrictions as those in appellant's deeds. Subsequently the restriction in the Stafford deed was removed by mutual agreement between the Staffords and appellee. Finally we find that a piece of property was sold without any restrictions to the Board of Education of Baltimore County. This property is now used in connection with a white school, but it might lawfully and not improbably be used in connection with a colored school, as it is adjacent to a colored settlement of 22 families. The properties sold to appellant, to Sayman, and to the Staffords are business properties, although appellant also erected a dwelling house on his lots. These lots are all small in comparison with the size of the whole tract. The first lot bought by appellant fronted 150 feet on Falls Road with a depth of 276 feet. The second lot fronted 25 feet on Falls Road with a depth of 292 feet 6 inches. The Sayman lot fronted 100 feet on Falls Road with a depth of 224 feet 6 inches. The Stafford lots were five and one-half acres and the school lot was 89/100 acres.

These facts, considered by themselves, give no indication of a general plan or intention on the part of the appellee to develop his tract as a restricted area. But appel-

lant urges that this is shown by the oral declarations of the appellee, and by his letter. The declaration alleged to have been made to appellant was that the appellee did not want any colored people on his property and did not want the colored people to come in further than they did at the time of the sale to appellant, and there was a clause in appellant's deeds that would keep him from ever selling to the colored people or renting to them. Mr. Sayman's account of the statement made by appellee to him goes further, and indicates that the appellee intended to keep the whole property as a white subdivision, but in his case, the list of restrictions attached to his option expressly negatives this contention. The Staffords did not testify. Mrs. Kelly, who had to leave the stone house because it was being sold to Negroes, said that the appellee rented the property to her at a time when he said he could have rented it to colored people for a store, but did not want to; that he had kept that property idle and had kept a bungalow idle for a number of years because he would not rent to colored people. The letter to Mr. Fenton, which is filed as an exhibit with the bill of complaint, presents the appellee's side of the story. He bought the whole tract 40 years ago, and that stopped the extent of the colored development below it. During that entire time, he tried to sell the property to white people. That was found impossible. He then offered it for manufacturing purposes, and sold the lots to appellant. Then he sold eight acres for a white night club, but this sale was prevented by public opinion in the neighborhood which protested the establishment of a night club. There is no doubt that this action by the appellant and others irked the appellee, and made him feel that his action in not selling any of his property to colored people was not appreciated, and, as a result, came his resolution to start selling it to those of the Negro race, which brought about this suit.

All of this, however, falls far short of proof of an intention by the appellee to adopt a general plan of restrictive development for his land. He undoubtedly had,

for a period of 40 years, an intention not to have any of the 74-acre tract occupied by Negroes. But that is a very different thing from having an intention to restrict it so that it could not ever be so occupied. In order to show a general plan of restrictive development, the intention to encumber the property with restrictions must appear, and not merely the intention not to do the things restricted. And there is nothing in the evidence before us which leads us to suppose that the appellee ever contemplated any general plan of development either with or without restrictions. He made only five isolated sales, and did not even have a plat prepared. The uncontradicted evidence is that the land was not suitable for residential development. We are obliged, therefore, to come to the conclusion that, while it may have been, and doubtless was, the intention of appellee not to have any colored people occupy any of the 74-acre tract as long as he owned any of it, nevertheless, it was not his intention to develop it as a restricted area, so that he could not sell his part of it in any way he wanted to.

The other point raised by appellant is whether it was the intention of appellee to impose restrictions upon the land retained by him for the benefit of the land sold, in the absence of any general scheme of land development. It has been held by this Court that restrictions are enforceable if it clearly appears from the intention of the parties that they should be mutual, and that they were imposed by the grantor for the benefit of his land and were not merely personal. In the case of *Clem v. Valentine*, 155 Md. 19, 141 A. 710, 713, it was said: "* * * if the language of the covenant, the respective positions of the parties, and the surrounding circumstances, taken singly or together, show that the covenant was entered into for the benefit of the land retained by the covenantee, creating an equity or right appurtenant to the land, to be exercised by such person as for the time being is the owner thereof, it will be enforced, without regard to whether the covenant does or does not run with the land, or whether or not it is a general scheme or plan of devel-

opment of the property in question." In the case before us we are unable to find that the restrictions in the deed were placed there for the benefit of the appellee's heirs or assigns, or for the benefit of his land for a period longer than the time he owned it. He had an intention not to permit colored people to occupy his land, as he frankly admitted in his letter. Very naturally, he did not want his grantee to permit such occupancy while he had that intention in mind. But nowhere does it appear that he intended to bind his land. On the contrary, his list of restrictions given to Sayman with the option expressly negatived such an idea. The burden is on the appellant to show by clear and convincing evidence that a mutual arrangement was intended. We do not think he has met that burden.

Since we are unable to find either that there was a general plan of restrictive development affecting the entire 74-acre tract, or that reciprocal mutual easements were created which would bind the land retained by appellee, the decree of the Chancellor will be affirmed.

*Decree affirmed with costs to appellee.*