737 A.2d 578

**Thomas Randolph SCHOVEE, et al.**

v.

**Eric J. MIKOLASKO, et al.**

**No. 4, Sept. Term, 1999.**

Court of Appeals of Maryland.

Sept. 21, 1999.

94

Brett Ingerman and Kurt J. Fischer (Michelle J. Dickerson, Piper & Marbury, L.L.P., on brief), Baltimore, for Petitioners.

Jerrold A. Thrope (Charles R. Bacharach, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, L.L.C., on brief), Baltimore, for Respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and ROBERT L. KARWACKI (retired, specially assigned), JJ.

WILNER, Judge.

The basic issue before us is whether the Circuit Court for Howard County erred in its application of the doctrine of implied negative reciprocal easement. The court subjected a 50–acre lot that was included in the subdivision plat of a 25–lot development community to restrictive covenants contained in a separately recorded Declaration of Covenants, Easements, Conditions and Restrictions, notwithstanding that the lot was not included in that Declaration, upon a finding from other evidence that the lot was intended by the developer to be part of the community. The Court of Special Appeals held that the circuit court erred in that regard, *Mikolasko v. Schovee,* 124 Md.App. 66, 720 A.2d 1214 (1998), and we shall affirm that holding.

## BACKGROUND

We are concerned here with a 168–acre development in Howard County known as Chapel Woods II, developed by J.J.M. Partnership (JJMP). The original subdivision plat for the development was recorded in November, 1989; it was amended, in a non-substantive way, by a Revision Plat recorded in April, 1990. The plat showed a development of 25 lots, to be served principally by Chapel Estates Drive, a road that would enter the development from the west and run easterly to a cul-de-sac at Lots 6 and 7. In conformance with then-existing zoning requirements, each of the lots comprised at least three acres. Lots 1 through 5 and 8 through 25 were

generally between three and four acres, although two of them—Lots 17 and 25—contained over six acres. Lot 6 comprised nearly 20 acres and Lot 7—the one at issue here—contained about 50 acres.

All of the property in the subdivision, with the exception of Lots 6 and 8, was owned by JJMP. Lot 6 was owned and occupied by a stranger to the developer; Lot 8 was owned individually by Eric Mikolasko, the vice-president of J.J.M., Inc., which, in turn, was the general partner of JJMP. Eric Mikolasko and his father, John, who served as president of JJMP, were apparently the driving force behind the development. According to Eric Mikolasko, the county required that Lot 6 be included in the plat and that the road be extended to it because it would otherwise be landlocked. He said that he had initially considered subdividing Lot 7 before recording the plat but, in anticipation of more favorable cluster zoning, chose not to do so.

Contemporaneously with the recording of the initial subdivision plat, JJMP recorded the Declaration. In a preamble to the Declaration, JJMP stated that it was the owner of a parcel of land known as Chapel Woods II, "(hereinafter referred to as 'the Community'), which is more particularly described in Exhibit A attached hereto and hereby made a part hereof." The declarant stated further its intent to create "on such real property" a residential community of single family homes for the benefit of the owners of such homes, and, to that end, declared that *the land described in Exhibit A* would be sold and conveyed subject to the easements, restrictions, covenants, and conditions thereafter set forth in the Declaration. Exhibit A described the property subject to the Declaration as "Lot Nos. 1 through 5 (inclusive) and 8 through 25 (inclusive) as shown on [the recorded plat]." [1] In so defining the proper-

---

1. As the Court of Special Appeals noted, although § 2.1 of the Declaration stated that the property contained 24 residential lots, in fact, by virtue of Exhibit A, it contained only 23 such lots. That discrepancy has not been made an issue in this case. Mikolasko suggests in his brief that it may arise from the fact that Lot 7 had been included as part of the property in an earlier draft of the Declaration but was removed

ty, and thus "the Community," the Declaration clearly did not include Lots 6 and 7.

Among the restrictions stated in § 4.1.1 of the Declaration were that no lot could be devoted to a use other than a residential use and that no lot may contain more than one detached residential structure at any time. Section 7.5.1 provided that the covenants and restrictions were to run with and bind upon the property for 40 years, subject to amendments approved by certain percentages of the owners, and were thereafter to be automatically renewed for successive terms of 10 years. Finally, for our purposes, § 7.5.3 permitted any owner, including the developer, "to amend the Community Plat with respect to those Lots owned by such Owner without the consent of any other Owner, so long as such amendment complies with all laws, ordinances, rules and regulations of the County and the State of Maryland."

Following the recording of the plat and the Declaration, JJMP began to sell the lots, eventually selling all 23 that were included under the · Declaration. The sales apparently involved at least three documents—a lot reservation agreement, some of which were entered into as early as March, 1988—more than a year before the Declaration and plat were recorded—a contract of sale, and a deed. The lot reservation agreement was in the nature of a preliminary sales agreement, setting forth some of the terms that would be included in a later contract of sale. Among other things, it identified the lot to be sold and the purchase price. Attached to the lot reservation agreement was a version of the plat that was later recorded showing the development (and showing also the Chapel Woods I development immediately to the south). The agreement stated that the property would be subject to recorded covenants, that the buyer would have 15 days prior to recordation to approve the covenants, and that if the buyer objected to the covenants, the agreement would be void.

from the final version of Exhibit A. The draftsman apparently forgot to make a conforming amendment to § 2.1.

The contract of sale specifically referred to the Declaration, which by then had been recorded and was attached to the contract as an exhibit. The contract also contained an integration clause, stating that the written agreement represented "the complete understanding between the parties" and superseded all prior negotiations, representations, promises, and statements as to the property, "or any other matter whatsoever," made or furnished by any real estate broker or other person representing or purporting to represent either party. As indicated, the Declaration, when coupled with Exhibit A, informed the buyer that Lots 6 and 7, which were shown on the plat of the development, were not subject to the Declaration and thus were not part of "the Community," as defined in the Declaration.

The deed also made specific reference to the Declaration. The parties acknowledged that title to the lot being conveyed was subject to the Declaration, which was specifically identified, that the provisions of the Declaration constitute a general plan or scheme of development and use "for all of that real property, situate and lying in said County, which is *therein* and hereinafter *referred to as the community* ... including the lot (*but not for any real property not within the Community,* as from time to time constituted)," and that the provisions of the Declaration were covenants running with, binding, burdening, and benefitting "the title to both the lot and the remainder of the Community." (Emphasis added.) Although not normally the case, the buyers of these lots signed the deeds to their respective lots.

The plaintiffs/petitioners consist of seven couples who purchased lots in the development between 1989 and 1991. Notwithstanding that each received a copy of the Declaration prior to signing the contract of sale and the deed, they claimed in their complaint that they had been led to believe that Lot 7 was part of "the community" and thus subject to the Declaration.

At some point, Mikolasko decided to embark on a Chapel Woods III development by combining *Lots 7 and 8 and*

subdividing the whole into nine new lots of between one and one-and-a-third acres each. Apparently, the county zoning law had been changed to permit lots of less than three acres, for no complaint of zoning violation has been made. Although the plat for that resubdivision was not recorded until February, 1996, it appears that construction, or pre-construction, work was commenced in 1995. That work, on Lot 7, caused concern among some of the homeowners, who met with Mikolasko in protest. At the time, Mikolasko took the position that (1) Lot 7 was not included in the Declaration and thus was not subject to the restrictions contained in the Declaration, and (2) as to Lot 8, which clearly *was* subject to the Declaration, § 7.5.3 of the Declaration which, as noted above, allows an owner to "amend the Community Plat" as to that owner's lot "without the consent of any other Owner," permitted him to · resubdivide that lot. That led the plaintiffs to file a six-count complaint seeking a variety of declaratory and injunctive relief. Although a number of issues were presented to the trial court, the essential questions were whether Lot 7 was encumbered by the restrictions in the Declaration and whether § 7.5.3, when read in the light of the other provisions of the Declaration, permitted Mikolasko to combine Lots 7 and 8 and resubdivide them as he intended.

The issues as to Lot 8 and the effect of the Declaration were resolved on summary judgment, the court finding and declaring that Lot 8 was expressly subject to the restrictions of the Declaration and that the Declaration prohibited construction of more than one residential dwelling on a lot. The latter holding followed from a rejection of Mikolasko's argument that § 7.5.3 authorized him to resubdivide Lots 7 and 8. Left open for trial was whether Lot 7 was subject to the restrictions of the Declaration under a theory of implied negative reciprocal easement. That doctrine, which we shall address in more detail later, recognizes, at least under certain circumstances, that when a common grantor develops land for sale in lots, pursues a course of conduct indicating an intention to follow a general plan or scheme of development with respect to the land, and imposes substantially uniform restrictions on

the lots conveyed, those same restrictions may be enforced against the land retained by the common grantor if that land is found to be part of the general plan of development and the buyers purchased their lots with that understanding. The plaintiffs' case in support of that doctrine came principally from four of the property owners—Mr. and Ms. Schovee, who purchased Lot 10 in 1989, Dr. Shah, who purchased Lot 5 in 1989, Mr. Kramer, who purchased Lot 9 in 1990, and Drs. Hogan and Macon, who purchased Lot 19. No evidence was presented from or with respect to the buyers of the other lots.

The evidence from the plaintiffs concerned representations allegedly made to them either by John Mikolasko or the real estate broker, Ms. Ramelmeier, and the plat that was shown to them when they were in the process of deciding whether to buy a lot in Chapel Woods II. Ms. Schovee, a banker, testified that she looked at the Chapel Woods II property several times, beginning in 1988, and that it was her "understanding" that the community was going to be "an exclusive community of twenty-five lots that were at least three acres in size, heavily wooded, private community." She was shown the as-yet-unrecorded plat that depicted 25 lots. Ms. Ramelmeier, she said, told her that the Mikolaskos were going to build their own homes on Lots 7 and 8, and that Lot 7 would be "part of the Chapel Woods Two community." Ms. Schovee said that she had read the Declaration and Exhibit A to it, but, notwithstanding its reference to Lots 1–5 and 8–25, she "focused on Lots 1 through 25 as the community." Her belief that all 25 lots, including even Lot 6, were part of the community and subject to the Declaration, was based on what was "represented on the map" when she walked the area prior to signing the lot reservation agreement and on a representation by Ms. Ramelmeier that "Lots 1 through 25 were going to be developed in the common scheme of the community according to the covenants." She said that she spoke with John Mikolasko, who informed her that he intended to build his home on Lot 7.

Mr. Schovee, a non-practicing member of the Bar, gave similar testimony. He too was given the map and walked the

property with Ms. Ramelmeier on a number of occasions before he signed the lot reservation agreement. He was told that there would be 25 estate lots, that Lot 7 would be part of the community, that John Mikolasko intended to build his house on that lot, and that he should not "worry about anything with respect to Lot 7." Ms. Ramelmeier informed him that there would be no further development of Lot 7. Mr. Schovee said that he read the Declaration but did not recall seeing Exhibit A to the Declaration. He testified that if he had been aware of the Exhibit, it would have raised concerns that, if not resolved, would have led him not to purchase the lot. Mr. Schovee never suggested that Exhibit A was not attached to the copy of the Declaration he received prior to signing the contract of sale.

Dr. Shah, an anesthesiologist, also walked the property and discussed the development with Ms. Ramelmeier. She was told, in 1988, that Lot 7 belonged to John Mikolasko and that "right now he's not going to do anything," but that "he will build something in [the] future for—for his own purpose." Although she acknowledged that Lot 6 was never part of the Chapel Woods II community, despite the fact that it was shown on the plat, Dr. Shah said that she always understood that Lot 7 "was part of Chapel Wood Two community." Dr. Shah said that she looked at the Declaration before she signed the sales contract but could not say that she read "each and every page." She was not concerned about Lot 6 because there was already a house on it.

Like the Schovees and Dr. Shah, Mr. Kramer, a certified public accountant, said that he was interested in Chapel Woods II because of the three-acre wooded lots that afforded privacy. He had expressed an interest in Lot 7 but was told by Ms. Ramelmeier that John Mikolasko was going to put his "estate lot" there. She added further, however, that Lot 7 was to be "part of the community plan" for Chapel Woods II. Kramer said that he read the Declaration—although he "could have missed a few words"—but that he nonetheless thought that "the community" consisted of the 25 lots shown on the plat. Like Mr. Schovee, he did not recall having seen Exhibit

A and acknowledged that it would have "raised a flag." Kramer did not recall Ms. Ramelmeier ever making any representation about whether Lot 7 could be subdivided; she said only that it was to be used by John Mikolasko as his "dream house."

Finally, in deposition testimony, Dr. Hogan recalled that Lots 6 and 7 were large lots that were not for sale and had a "vague recollection" that Ms. Ramelmeier thought that the developer was going to build a house on Lot 7 for himself. Dr. Macon recalled Ms. Ramelmeier saying that Lot 7 would not be subdivided, in part because of its topography and in part because the owner liked it the way it was. Both of them remembered Ms. Ramelmeier saying that all of the lots would be at least three acres.

John Mikolasko testified that, when JJMP acquired the property, the zoning law required that the lots be a minimum of three acres, that he had actually resubdivided Lot 25 and had attempted, unsuccessfully, to resubdivide Lot 4. He said that it was his intent to create a common scheme or plan that could be changed by anyone consistent with zoning regulations, and he regarded § 7.5.3 of the Declaration as authorizing those changes. Mr. Mikolasko said that he had initially intended to build a house for himself on Lot 7 and to sell part of that lot, but that, due to failing health, he instead built his home in Florida. Ms. Ramelmeier denied telling anyone that Lot 7 would not be further subdivided. She said that most of the prospective buyers asked about that lot, and she told them that John Mikolasko intended to build a house there.

The court, as noted, rejected Mr. Mikolasko's view of § 7.5.3. and found that, despite the evidence produced by him to the contrary, there *was* an intent to create a common scheme that would prohibit lots of less than three acres. With respect to Lot 7, the court recognized that it was undisputed that the lot was not expressly subject to the restrictions in the Declaration. Nonetheless, it drew from our decision in *Turner v. Brocato*, 206 Md. 336, 111 A.2d 855 (1955), the view that, under the doctrine of implied negative reciprocal ease-

ment, restrictions may be enforced against land not expressly subject to them if the party seeking that enforcement shows that (1) a common owner subdivided property into a number of lots for sale, (2) the common owner had an intention to create a general scheme of development for the property as a whole, in which the use of the land was restricted, (3) the vast majority of subdivided lots contain restrictive covenants that reflect the general scheme, (4) the property against which application of an implied covenant is sought was intended to be part of the general scheme of development, and (5) the purchaser of the lot in question had notice, actual or constructive, of the condition.

After reviewing the evidence presented by the plaintiff/petitioners, the court held that each of those elements was satisfied. The testimony, it said, was unrefuted that JJMP was "the subdivider and common grantor of the lots in the Chapel Woods II subdivision." The court found that the evidence also established a common scheme of development "for the property as a whole," in which the use of the property was restricted. The maps, the Declaration, and promotional materials "all reflect a common scheme of development." With the exception of Lots 6 and 7, all of the lots were expressly encumbered by the covenants in the Declaration which ran with the land, and Mikolasko, by signing the Declaration and the deeds, had notice of the restrictions. Lot 7, the court noted, had the same frontage on Chapel Estates Drive as the other lots, and, when viewed in conjunction with the plat and the representations made by JJMP and its agents, it was reasonable for a potential customer to conclude that Lot 7 was to be part of the general plan of development. In summary, the court found as fact that JJMP intended to create a common scheme of development of sizeable residential lots upon which only one residential structure could be erected and that JJMP and its agents represented that Lot 7 would be part of the common scheme. On that basis, the court found the doctrine applicable and the restrictions in the Declaration enforceable against Lot 7. On November 25, 1997, the court entered a declaratory

judgment that Lots 7 and 8 were subject to the restrictions of the Declaration and could not be further subdivided.

The Court of Special Appeals affirmed the judgment as to Lot 8 but reversed as to Lot 7. Its disagreement with the circuit court as to Lot 7 arose from the latter's consideration of the Declaration as just one piece of evidence and basing its finding on the plat, various representations made by Mikolasko or Ramelmeier, and promotional materials. The recorded Declaration, it noted, "contains a different description of the property to be included in the community" than those other items of evidence. *Mikolasko v. Schovee, supra*, 124 Md.App. at 74, 720 A.2d at 1218.

Distinguishing *Turner v. Brocato, supra*, 206 Md. 336, 111 A.2d 855, on the ground that there was no recorded Declaration in that case, the intermediate appellate court drew from out-of-State cases and from the views of commentators the principle that "when a common development scheme or subdivision is established by a recorded document setting forth the restrictions upon the property, which document also describes the property to be included, the presumption is raised that only the property therein described will be included in, and thus burdened and benefitted by the restrictions of, the common development scheme." *Mikolasko, supra*, 124 Md.App. at 80, 720 A.2d at 1220. That principle, it said, was based on three subordinate principles long recognized in Maryland law—(1) that restrictive covenants are strictly construed and are to be resolved in favor of free use of the property, (2) that what is implied must yield to what is expressed, and (3) that an "intent to bind a given piece of property must be clearly expressed." *Id.* at 81, 720 A.2d at 1221. In light of the facts that the buyers were given the option in the Lot Reservation Agreement to withdraw if they did not approve of the covenants, that the Declaration clearly indicated which property was included in the common scheme, that the Declaration was recorded before any of the lots were sold, and that the Declaration was incorporated into each of the deeds by reference, the court held that the presumption that only the land

included in the Declaration was subject to it was not rebutted. *Id.* at 82, 720 A.2d at 1222.

Petitioners, naturally, take issue with the Court of Special Appeals' conclusions. They urge that the implied negative reciprocal easement doctrine may be invoked to burden a lot that is not expressly described in a Declaration of Covenants and that the evidence in this case adequately supported the circuit court's finding that Lot 7 was intended to be part of the common scheme of development of Chapel Woods II and thus subject to the restrictions applicable to all other lots in that subdivision.

## DISCUSSION

Petitioners essentially concede that, if restrictive covenants are created by a recorded Declaration, the Declaration defines the property subject to the restrictions, and it does not include within that definition a particular lot or tract of land, there is a presumption that the restrictions in the Declaration do not apply to that lot or tract. Their point is that the determination of whether there is a general scheme of development and whether particular land is included within that development are issues of fact for the court to determine, that the presumption arising from the omission of particular land from the Declaration may be easily overcome by other evidence establishing the various elements of the implied negative reciprocal easement doctrine, and that such evidence, sufficient to support the circuit court's findings, was presented in this case. Their basic disagreement with the Court of Special Appeals is that the appellate court failed to give proper consideration to that evidence and proper deference to the factual findings of the circuit court. Mikolasko, on the other hand, asserts that, when restrictions are imposed by a recorded Declaration that defines the land subject to them, rather than by individual deeds to various grantees of the lots, there is no reason or basis to apply by implication those restrictions on land not included under the Declaration. He contends that "[t]he equitable considerations that justify the implication of restrictions on property unrestricted by deed are wholly lacking

where a uniform declaration of covenants spells out exactly what property the developer intends to subject to the restrictions, because each purchaser takes with full knowledge of how far the general scheme of development extends." Brief for Respondent at 13. Both sides have cited a number of Maryland and other cases, as did the Court of Special Appeals, in support of their respective positions, but, as all seem to acknowledge, the cases are all fact-specific and none involved precisely what occurred here.

There have been a plethora of cases in Maryland, dating back to *Thruston v. Minke,* 32 Md. 487 (1870), in which someone has attempted to subject land retained by a common grantor to restrictions not expressly applicable to that land, often, but not always, on a theory that the retained land was part of a general plan of development. Nearly all of the cases in which that theory has been asserted have rested on a determination of whether (1) there was, in fact, a general plan of development, and (2) if so, the retained land was intended to be a part of the development. In *McKenrick v. Savings Bank,* 174 Md. 118, 197 A. 580 (1938), we reviewed more than a dozen of the earlier cases and drew from them the following principles:

"That one owning a tract of land, in granting a part thereof, may validly impose upon the part granted restrictions upon the use thereof for the benefit of the part retained, and upon the part retained for the benefit of the part granted, or upon both for the benefit of both; that, where the covenants in the conveyance are not expressly for or on behalf of the grantor, his heirs and assigns, they are personal and will not run with the land, but that, if in such a case it appears that it was the intention of the grantors that the restrictions were part of a uniform general scheme or plan of development and use which should affect the land granted and the land retained alike, they may be enforced in equity; *that covenants creating restrictions are to be construed strictly in favor of the freedom of the land, and against the person in whose favor they are made; and that the burden is upon one seeking to enforce such restrictions,*

*where they are not specifically expressed in a deed, to show
by clear and satisfactory proof that the common grantor
intended that they should affect the land retained as a part
of a uniform general scheme of development."*

*Id.* at 128, 197 A. at 584–85 (emphasis added). As in most of
the earlier cases, we held in *McKenrick* that the evidence did
not suffice to establish an intent to make the restrictions
included in certain out-deeds part of a uniform scheme of
development so as to bind land retained by the grantor. *Id.* at
131, 197 A. at 586.

In *McKenrick* and in all of the cases before and since, the
assertion of an implied reciprocal restriction arising from a
general plan of development was premised not on a recorded
Declaration defining the land subject to the restrictions or
from a recorded plat noting the imposition of restrictions on
the lots shown in the plat, but either from the inclusion by a
common grantor of uniform restrictions in individual deeds to
specific lots or from oral commitments made to purchasers of
lots subject to restrictions that subsequent conveyances of
retained land would be subject to the same restrictions. In-
deed, the implied negative reciprocal easement doctrine
evolved to deal with precisely those situations. *See* RESTATE-
MENT (THIRD) OF PROPERTY: SERVITUDES, § 2.14 cmt. b (Tenta-
tive Draft No. 1, 1989); 2 AMERICAN LAW OF PROPERTY, § 9.33
(1952); 3 HERBERT TIFFANY, THE LAW OF REAL PROPERTY,
Chapter 18, § 867 (3d ed.1939).

The device of *implying* restrictive covenants on land re-
tained by a grantor, as a matter of property law, in those
situations avoided some thorny problems that arose when
enforcement was sought under contract theories. As the
Restatement and some commentators point out, the implied
negative reciprocal easement or servitude doctrine arose be-
fore the advent of comprehensive zoning in order to provide a
measure of protection for those who bought lots in what they
reasonably expected was a general development in which all of
the lots would be equally burdened and benefitted. In those
early days, it was uncommon for the developer to evidence the
development or impose uniform restrictions through a record-

ed Declaration that would later be incorporated in individual deeds. They often filed subdivision plats of one kind or another but did not take the extra step of using one instrument to impose the restrictions. The common, almost universal, practice, instead, was for the developer to place the restrictions in the deeds to individual lots and, sometimes, to represent to the purchasers of those lots that the same restrictions would be placed in subsequent deeds to the other lots. Litigation arose most frequently when the developer then neglected to include the restrictions in one or more of the subsequent deeds and those buyers proceeded or proposed to use their property in a manner that would not be allowed by the restrictions.

In that setting, apart from having to wrestle with such issues as the Statute of Frauds and whether Buyer A could enforce restrictions on the property of Buyer B when there was no privity between them, the courts were faced with having to determine, purely by implication from the circumstances, whether the grantor actually intended to create a general plan of development and, if so, what land was to be included within the development. Those were issues of fact, to be resolved from whatever relevant evidence was available—the individual deeds, any recorded plats, specific representations or promotional material used in marketing the lots, and the testimony of the buyers as to their expectations.

A reading of the cases, in Maryland and elsewhere, reveals that to have been the predominant context in which the doctrine evolved. *See,* for example, *Scholtes v. McColgan,* 184 Md. 480, 489, 41 A.2d 479, 483–84 (1945), where we noted that, although the intention to adopt a general plan of development may be indicated in different ways, "the simplest method is to include all of the restrictions in every deed, and to state that they bind not only the property conveyed, but also the property retained, and that they are placed upon the property for the benefit of the owners of all parts of it." We observed as well that, because the intention of the parties is a question of fact, testimony was admissible "that the owner of the property at the time he sold lots from it, held out to the purchasers that

the whole tract would become a restricted area, and that the purchasers relied on his statements." *Id.,* 41 A.2d at 484. *See also Club Manor, Inc. v. Oheb Shalom Cong.,* 211 Md. 465, 479, 128 A.2d 405, 412 (1957). The Maryland case most clearly illustrating that context, and the principles devised to deal with it, is *Turner v. Brocato, supra,* 206 Md. 336, 111 A.2d 855, in which this Court found a general scheme of development.

The relevant facts in *Turner* were as follows. In 1927, Fenwick, purchased a 47–acre tract between Falls Road and the Roland Park development in Baltimore City, intending to subdivide it and sell the lots for expensive residences. The initial plat, recorded in 1927, subdivided the tract, which became known as Poplar Hill, into three sections. Section A contained 38 lots; Section B contained 37 lots; Section C, which fronted on Falls Road, showed no lot subdivision. In August, 1927, Fenwick sold the first lot, from Section A, subject to a set of restrictions incorporated into the deed that, among other things, restricted the lot to residential use and prohibited commercial establishments. In that first deed, Fenwick covenanted that those restrictions would apply to all lots in Section A, but not to any of Fenwick's other remaining property. A few days later, he sold another lot, from Section B. The deed to that lot contained the same restrictions, along with a covenant that they would apply to all lots in Section B, but not to the grantor's other remaining land. Thereafter, a number of lots were sold from Sections A and B, all subject to the same restrictions. Two years later, Fenwick sold the first lot in Section C, incorporating in that deed, by reference, the same restrictions applicable to lots in Sections A and B. Early in the development, Fenwick ceased making any reference to his remaining land in the various deeds. Only two of 58 deeds executed after 1929 mentioned Fenwick's remaining land, and they were in 1931.

In 1930, Fenwick prepared a revised plat that contained no reference to Sections A, B, or C, but showed, in addition to the 75 lots that previously had been in Sections A and B, 12 additional lots in what previously had been Section C. Al-

though the revised plat was not recorded, a number of subsequent conveyances of lots from Section C made reference to it. Unnumbered on the revised plat was a "finger of land" that had been part of Section C, running about 500 feet along Falls Road. That "finger" was the only part of the original 47–acre tract not containing the uniform restrictions placed in all of the deeds. Two parts of it were sold without restrictions; Fenwick continued to own the remaining part. The issue was whether one of the two parts that had been sold without the restrictions, eventually purchased by Brocato, was nevertheless subject to them under the implied negative reciprocal easement doctrine. We observed that the other lot sold without restrictions, because of its location, was not regarded by the residents of Poplar Hill as being part of the development, and that no complaint had been made about the owner's use of it for a store and adjacent parking lot. We noted as well that a sign advertising Poplar Hill as a restricted development stood for 20 years on Brocato's lot.

*Turner v. Brocato* is a long opinion, much of which need not be recounted here. It was "admitted" that there was a general plan of development of all of Sections A and B from the time sales began. When Section C opened 18 months later, the same restrictions were imposed on the lots initially sold from that section as had been imposed on lots from Sections A and B, and thus, "with the opening of Section C, all distinction between the various sections was done away with." *Id.* at 349–50, 111 A.2d at 862. After quoting from *McKenrick*, we noted that we had long recognized that "equity, under appropriate facts, will enforce what variously has been called reciprocal negative easements, implied equitable reciprocal servitudes or merely equities attached to land," and that, "[i]n determining whether the facts justified relief, the Maryland cases, early and late, consistently have looked not only to language in deeds, which gratified the requirements of the statute of frauds, but also to matters extrinsic—conduct, conversation and correspondence—to find and give effect in equity to the actual intent." *Id.* at 346–47, 111 A.2d at 861. All of the extrinsic evidence—the promotional efforts and advertise-

ments, the sign erected on Brocato's lot, the language in the deeds, the testimony of the lot purchasers—confirmed an intent to include all of the land within the 47–acre tract under the restrictions. Thus:

> "We think that there is to be found from all the evidence, including the deeds, an intent by Fenwick to bind all of the land in Poplar Hill by restrictions similar to those imposed, in substantial uniformity on each lot sold. We find, too, that the appellees bought with notice of the right of lot owners to require that this burden remain attached to the land, not only while in Fenwick's hands, but after the sale to one with notice, even though the restrictions were not expressly imposed on the lot so sold."

*Id.* at 349, 111 A.2d at 862.

The issue of notice was raised by Brocato. We concluded that he had not only actual notice under the circumstances but also constructive notice from the land records that showed, among other things, the substantially uniform restrictions placed on each lot and the deeds in which Fenwick entered into the covenants for himself, his heirs, and assigns, indicating that the restrictions ran with the land and were not merely personal.

The parties have very different views about *Turner v. Brocato.* Petitioners stress the passages confirming that an intent to create a general plan of development and thereby subject retained land to uniform restrictions placed on lots sold to others may be found from extrinsic evidence, and thus they downplay the fact that Lot 7 was not included in the Declaration. Non-inclusion of the lot in the Declaration, they urge, is merely presumptive, and therefore rebuttable, evidence of an intent to exempt the lot. Mikolasko, on the other hand, notes the fact that there was no Declaration or comparable instrument in *Turner* and thus looks at that case as approving a resort to extrinsic evidence only "where the developer's intent as to how far a common scheme of development extends is not clearly spelled out." Brief for Respondent at 15.

■ We need to keep in mind both the function of the implied negative reciprocal easement doctrine, which is to serve as a basis for subjecting land not otherwise burdened by them to restrictions applicable generally throughout a planned development, and its historical context. To the extent that land is expressly subjected to restrictions by an instrument forming part of its chain of title, the doctrine would ordinarily have no application, for there is no reason to *imply* a burden that is already *expressly* imposed. The interplay between the doctrine and an instrument (or combination of instruments) that both creates the uniform restrictions and delineates the land subject to them arises only with respect to land not expressly included under the instrument and then only from the implication that, by delineating the land included under the instrument, the grantor intended that the restrictions apply only to that land and to no other. It is in that context that we may characterize such an instrument as presumptive evidence of the grantor's intent—a presumption that the grantor did not intend for the restrictions to apply to any land not expressly included. The presumption, in that sense, creates the prospect of opposing implications—an implied intent on the part of the grantor that *all* land included, or represented as being included, within a general development be subjected to uniform restrictions established as part of that general development *versus* an implied intent on the part of the grantor that land not delineated in the instrument creating the restrictions not be subject to those restrictions, either because that land is not to be regarded as part of the general development or, if it is, that it nonetheless is not to be burdened by the restrictions.

An instrument that both creates the uniform restrictions and delineates the land subject to them, if properly recorded, and especially if actually brought to the attention of prospective purchasers, has a further significance, beyond merely evidencing the grantor's intent. It necessarily impacts on the expectations—or at least the reasonableness of the expectations—of those who purchased lots in the subdivision. Absent some compelling circumstance, purchasers cannot be allowed

to claim ignorance of that which is clearly set forth in a recorded instrument in the chain of title to their respective lots, especially when that instrument (1) is actually given to them, and (2) is specifically referred to in their contracts of sale and deeds. Indeed, the Restatement now takes the position that "[t]he implied reciprocal servitudes doctrine comes into play *only* when the developer does not follow the practice of recording a declaration of servitudes applicable to the entire subdivision *or other general plan area.*" RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES, *supra,* cmt. i (emphasis added).

■■■ We need not, and do not, go so far as the Restatement in holding the doctrine inherently inapplicable in the case of a recorded Declaration, for there may be instances in which the developer, through its conduct, creates a basis for implying restrictions to retained land that was not included in the Declaration. When the developer uses such an instrument to create the restrictions and define the land subject to them, however, that instrument is not merely a piece of evidence, to be viewed with other evidence in determining whether there was a general plan of development and what property is subject to the restrictions imposed on that development. The instrument ordinarily suffices to establish both facts.

■■ The Declaration at issue here, especially when coupled with the language in the various deeds, establishes with virtually unimpeachable clarity both that JJMP did not intend to subject Lot 7 to the restrictions imposed on Lots 1 through 5 and 8 through 25, and that the purchasers of those lots knew, at least constructively, that Lot 7 was excluded from the Declaration. Not only did the Declaration specify the lots to be included, it also expressly defined "the Community" as encompassing only those lots. The deeds made specific reference to the Declaration and characterized it as constituting a general plan of development for the property defined in it as "the Community," and as excluding "any real property not within the Community."

The only issue, then, is whether JJMP, directly or through its agents, acted inconsistently with its exclusion of Lot 7 from "the Community," and, through its conduct, afforded a basis to apply the doctrine. We see no such basis in this record. As noted, only four of the purchasers testified. The evidence they presented was that, prior to signing their contracts of sale, they were shown a plat of Chapel Woods II that contained 25 lots, that they were informed that all of the lots in the Chapel Woods II development would be at least three acres, and that John Mikolasko intended to build his home on Lot 7. Only two of them—Mr. Schovee and Dr. Macon—recalled being told by Ms. Ramelmeier that Lot 7 would not be further subdivided. Mr. Schovee, a lawyer, acknowledged that, if he had been aware of Exhibit A to the Declaration, which, constructively at least, he was, it would have raised concerns that, unless satisfied, would have caused him not to purchase the lot. Testimony from two people that they were told by a sales agent that Lot 7 would not be re-subdivided hardly suffices as sufficient evidence of an intent by JJMP that Lot 7 was to be included within "the Community" in the face of (1) the unambiguous provision in the Declaration and the deeds to the contrary, and (2) the integration clause in the contracts of sale, making clear that the written contract, which referred to and incorporated the Declaration, represented "the complete understanding between the parties" and superseded all prior negotiations, representations, statements, and promises relating to the property by any sales agent or anyone else. Whatever expectations the four buyers may have had prior to signing their contracts of sale, there was no reasonable basis upon which they could believe, when they signed those contracts and when they later signed their deeds, that Lot 7 was part of "the Community" and was therefore subject to the restrictions set forth in the Declaration. The Court of Special Appeals was entirely correct in holding that the presumption of non-inclusion of Lot 7 had not been rebutted.

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.

Dissenting opinion by CATHELL, J.

CATHELL, Judge, dissenting:

I respectfully dissent. The majority, in my view, as did the Court of Special Appeals, has substituted its assessment of the evidence and the witnesses for that of the trial court.

The trial court had before it at least the following *Turner v. Brocato*[1] evidence. The parcel at issue was given a lot number, No. 7,[2] and shown on the plats of the property, which evidences that it was intended in some fashion to be part of the subdivision. (Otherwise, why give it a number—why not indicate it as "other lands of the owner," "land reserved by the owner," or a similar designation?) Moreover, numbering that lot was necessary in order for there to be twenty-five lots in the subdivision as the plat indicated. If the developer had not wanted the land to be part of the subdivision, he could have done so by merely leaving the parcel unnumbered and not including it in the subdivision.

Additionally, Lot 7 was situated so as to be considered a logical part of the subdivision, having, as I recall, similar road frontage as the other lots. It was owned by the common developer of the property. There was evidence that neither the developer nor his agent ever expressly informed the purchasers that the lot shown on the plat as Lot 7 in the subdivision was excluded from the development, or that it would be further subdivided. Instead, there was sufficient evidence before the trial court to the contrary.

Prior to purchasing her land, Ms. Schovee was shown an unrecorded plat by the developer's agent that showed a development of twenty-five lots. In order for there to have been twenty-five lots, Lot 7, by necessity, would had to have been included. She further testified that the agent told her that the developer was going to build his own home on Lot 7, that it would be part of the development, and that all twenty-five lots were included in the common scheme of development.

---

1. 206 Md. 336, 111 A.2d 855 (1955).

2. There were actually two lots, numbers six and seven, omitted from the Declaration. This dissent focuses on Lot 7.

Mr. Schovee confirmed the testimony of Ms. Schovee, and was himself told by the agent that he should not worry about Lot 7 because there would be no further development of the lot.

Dr. Shah testified that she was told by the developer's agent that Lot 7 was to remain owned by the developer and that he would build "something" for himself on it. She was led to understand that Lot 7 was part of the development. Mr. Kramer stated that he expressed interest in buying Lot 7 to the developer's agent. Instead of being told that it was not part of the development, Mr. Kramer was told that the developer was going to use it for his "estate lot." The agent expressly told Mr. Kramer that the lot was part of the community to be retained by the developer for his "dream house." Dr. Hagon testified that he recalled being told by the agent that the developer was going to build his house on Lot 7. Dr. Moran recalled being told by the developer's agent that Lot 7 would not be further developed.[3]

Every witness for the plaintiffs testified as to the representations made by the developer's agents, which were entirely consistent with a developmental scheme including all of the twenty-five lots. That evidence, if believed by the trier of fact, as apparently it was, was sufficient to support the trial court's decision.

What occurred in the case *sub judice* is a real estate developer's version of tactics similar to "bait and switch," which we ought to condemn. The developer's agent showed prospective buyers an initial plat that displayed twenty-five lots under circumstances that can lead to no other conclusion but that it is a twenty-five lot subdivision. Then by a subsequent document, in this case a declaration, the developer uses the omission of textual language to delete, by nondescription, one or more of the lots from the limitations of the development, knowing the tendency of purchasers to focus on maps and plats, rather than the omissions in the text of a subsequent document.

---

3. At this point, this case walks and quacks like a duck.

It is interesting that rather than including prominent language on the initial plats indicating to purchasers that Lot 7 was omitted or making an express statement in the declaration that Lot 7 was to be omitted or putting a prominent notation on "Exhibit A" that Lot 7 was omitted, the developer elected to use a tactic that had a high probability of not being noticed. He just left Lot 7 out: "Lots Nos. 1 through 5 (inclusive) and 8 through 25 (inclusive) as shown on [the recorded] plat. . . ." New purchasers and their title attorneys would be examining the documents looking for the inclusion of their lots in the subdivision, not for what was excluded by mere omission.

The trial court considered that the evidence before it met the *Turner v. Brocato* standard for representing to purchasers that there was a common scheme of development that included Lot 7. In my view, although there was evidence to the contrary, the evidence supporting the trial court's decision was sufficient. The trial court, not this Court, is the weigher of fact and credibility. The lower court should be affirmed and the Court of Special Appeals reversed.

Moreover, the holding of the majority may encourage unscrupulous developers to use deceptive tactics in the sale of lots in their subdivisions. All a developer has to do now is use the services of an agent to offer something in the sales process, and then take it away by purposely omitting it in the extensive postsales period documentation.

I believe that the majority, and the Court of Special Appeals, have improperly usurped the function of the trial court as a trier of fact, that the *Turner v. Brocato* evidence in the case *sub judice* is stronger than it was in *Turner v. Brocato*, that the holding of the majority is incorrect in light of *Turner v. Brocato*, and that the Court's opinion will encourage questionable practices in the real estate development field. I would reverse the Court of Special Appeals.